Craig E. Weinerman, OSB No. 96013
Assistant Federal Public Defender
151 W. 7th Avenue, Suite 510
Eugene, OR 97401
Craig_Weinerman@fd.org
(541) 465-6937 (telephone)
(541) 465-6975 (facsimile)

Attorney for Defendant



FILED'06 SEP 08 16:01USDC-ORE

FILED'06 JUL 21 16:24USDC-ORE

~~SEALED~~

REDACTED

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>CHELSEA DAWN GERLACH,<br><br>Defendant. | 60079<br>CR 06-60011-AA<br><br>PETITION TO ENTER PLEA OF GUILTY, CERTIFICATE OF COUNSEL, AND ORDER ENTERING PLEA |

The defendant represents to the court:

1.    My name is Chelsea Dawn Gerlach.  I am 29 years old.  I have completed high school and some college.

2.    My attorney is Craig E. Weinerman.

Page 1 -    Petition to Enter Plea of Guilty, Certificate of Counsel, Order Entering Plea

3.   My attorney and I have discussed my case fully.  I have received a copy of the Indictment or Information.  I have read the Indictment or Information, or it has been read to me, and I have discussed it with my attorney.  My attorney has counseled and advised me concerning the nature of each charge, any lesser-included offense(s), and the possible defenses that I might have in this case.  I have been advised and understand that the elements of the charge(s) alleged against me to which I am pleading "GUILTY" are as follows:

**Count 1 (conspiracy to commit arson and destruction of an energy facility):** that the defendant (1) agreed with at least one other person to commit an offense; (2) became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it; and (3) one of the members of the conspiracy performed at least one overt act for the purpose of carrying out the conspiracy.

**Counts 2-3 and 5-18 (aiding and abetting arson and attempted arson):** that the defendant (1) knowingly and intentionally aided, counseled, commanded, induced, or procured; (2) the commission of the offense of arson or attempted arson; (3) involving the malicious damage to or destruction of, or the attempt to damage or destroy; (4) by means of fire; (4) any building, vehicle, or other real or personal property; (5) used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce.

O:\CLIENT\Weinerman\Gerlach\05-60011 Pleadings\plea petition 3.wpd

**Count 4 (destruction of an energy facility):** that the defendant (1) knowingly and willfully; (2) damaged or attempted to damage; (3) the property of an energy facility; (4) in an amount that in fact exceeded or would have, if the attempted offense had been completed, exceeded $100,000.

I have had a full and adequate opportunity to disclose to my attorney all facts known to me that relate to my case.

4.     I know that if I plead "GUILTY," I will have to answer any questions that the judge asks me about the offense(s) to which I am pleading guilty. I also know that if I answer falsely, under oath, and in the presence of my attorney, my answers could be used against me in a prosecution for perjury or false statement.

5.     I am not under the influence of alcohol or drugs. I am not suffering from any injury, illness or disability affecting my thinking or my ability to reason. I have not taken any drugs or medications within the past seven (7) days.

6.     I understand that conviction of a crime can result in consequences in addition to imprisonment. Such consequences include deportation, or removal from the United States, or denial of naturalization, if I am not a United States citizen; loss of eligibility to receive federal benefits; loss of certain civil rights (which may be temporary or permanent depending on applicable state or federal law), such as the right to vote, to hold public

office, and to possess a firearm; and loss of the privilege to engage in certain occupations licensed by the state or federal government.

       7.     I know that I may plead "NOT GUILTY" to any crime charged against me and that I may persist in that plea if it has already been made. I know that if I plead "NOT GUILTY" the Constitution guarantees me:

        a.     The right to a speedy and public trial by jury, during which I will be presumed to be innocent unless and until I am proven guilty by the government beyond a reasonable doubt and by the unanimous vote of twelve jurors;

        b.     The right to have the assistance of an attorney at all stages of the proceedings;

        c.     The right to use the power and process of the court to compel the production of evidence, including the attendance of witnesses in my favor;

        d.     The right to see, hear, confront, and cross-examine all witnesses called to testify against me;

        e.     The right to decide for myself whether to take the witness stand and testify, and if I decide not to take the witness stand, I understand that no inference of guilt may be drawn from this decision; and

        f.     The right not to be compelled to incriminate myself.

       8.     I know that if I plead "GUILTY" there will be no trial before either a judge or a jury, and that I will not be able to appeal from the judge's denial of any pretrial

O:\CLIENT\Weinerman\Gerlach\05-60011 Pleadings\plea petition 3.wpd

motions I may have filed concerning matters or issues not related to the court's jurisdiction.

9. I this case I am pleading "GUILTY" under **Rules 11(c)(1)(A)** and **11(c)(1)(B)**. My attorney has explained the effect of my plea under Rule 11(c)(1)(A) to be as follows:

> I plead guilty under Rule 11(c)(1)(A), pursuant to a Plea Agreement whereby the prosecutor has promised to dismiss or not bring other charges against me; therefore, at or before sentencing, the judge must either accept the Plea Agreement or allow me to withdraw my plea.

My attorney has explained the effect of my plea under Rule 11(c)(1)(B) to be as follows:

> I plead guilty under Rule 11(c)(1)(B); therefore, although the judge will consider the recommendations and agreements of both the prosecution and the defense attorneys concerning sentencing, the judge is not obligated to follow those recommendations or agreements. If the judge imposes a sentence different from what I expected to receive under the terms of my plea agreement with the prosecutor, I do not have a right to withdraw my plea

10. I know the maximum sentence which can be imposed upon me for the crime(s) to which I am pleading guilty is as follows:

**Count 1 (conspiracy to commit arson and destruction of an energy facility):** 5 years, and a fine of $250,000. There is no mandatory minimum sentence.

**Counts 2-3 and 5-18 (arson and attempted arson):** 20 years and a fine of $250,000, and a mandatory minimum sentence of 5 years, which may run concurrent to sentences imposed on other counts.

*or consecutively* *on record* *9/21/06*

**Count 4 (destruction of an energy facility):** 20 years and a fine of $250,000. There is no mandatory minimum sentence.

11.    I know that the judge, in addition to any other penalty, will order a special assessment as provided by law in the amount of $100 per count of conviction.

12.    I know that if I am ordered to pay a fine, and I willfully refuse to pay that fine, I can be returned to court, where the amount of the unpaid balance owed on the fine can be substantially increased by the judge and I can be imprisoned for up to one year.

13.    My attorney has discussed with me the Federal Sentencing Guidelines. I know The Guidelines are advisory, not mandatory. I also know the sentencing judge, in determining the particular sentence to be imposed, must consider those factors set forth in Title 18, United States Code, Section 3553(a), including, but not limited to: the nature and circumstances of the offense, my own history and characteristics, the goals of sentencing (punishment, deterrence, protection, and rehabilitation), and the sentencing range established by the advisory Guidelines. If my attorney or any other person has calculated a guideline range for me, I know that this is only advisory, and is only one of the factors that the judge will consider in making a final decision as to what sentence will be imposed. I also know

that a judge may not impose a sentence greater than the maximum sentence referred to in paragraph (10) above.

14.     I know from discussion with my attorney that, under the Federal Sentencing Guidelines, if I am sentenced to prison I am not entitled to parole. I will have to serve the full sentence imposed except for any credit for good behavior that I earn. I can earn credit for good behavior in prison at a rate of up to 54 days for each year of imprisonment served. Credit for good behavior does not apply to a sentence of one year or less.

15.     I know that if I am sentenced to prison, the judge will impose a term of supervised release to follow the prison sentence. During my supervised release term I will be supervised by a probation officer according to terms and conditions set by the judge. In my case, on all counts, a term of supervised release must be at least three years. If I violate the conditions of supervised release, I may be sent back to prison for up to two years.

16.     I know that in addition to or in lieu of any other penalty, the judge can order restitution payments to any victim of any offense to which I plead guilty. I am also informed that, for certain crimes of violence and crimes involving fraud or deceit, it is mandatory that the judge impose restitution in the full amount of any financial loss or harm caused by an offense. If imposed, the victim can use the order of restitution to obtain a civil judgment lien. A restitution order can be enforced by the United States for up to

twenty (20) years from the date of my release from imprisonment, or, if I am not imprisoned, twenty (20) years from the date of the entry of judgment. If I willfully refuse to pay restitution as ordered, a judge may resentence me to any sentence which could originally have been imposed.

17. On any fine or restitution in an amount of $2,500 or more, I know that I will be required to pay interest unless that fine or restitution is paid within fifteen (15) days from the date of the entry of judgment.

18. If I am on probation, parole, or supervised release in any other state or federal case, I know that by pleading guilty in this court my probation, parole or supervised release may be revoked and I may be required to serve time in that case, which may be consecutive, that is, in addition to any sentence imposed on me in this court.

19. If I have another case pending in any state or federal court, I know that my Petition in this case does not, in the absence of an express and written agreement, apply to my other case(s), and that I can be faced with consecutive sentences of imprisonment.

20. My plea of "GUILTY" is based on a Plea Agreement that I have made with the prosecutor. That Plea Agreement is attached hereto and incorporated herein. I have read or had read to me the Plea Agreement, and I understand the Plea Agreement.

21. No officer or agent of any branch of government (federal, state or local) or anyone else has promised or suggested that I will receive a lesser term of imprisonment,

**Page 8 -** **Petition to Enter Plea of Guilty, Certificate of Counsel, Order Entering Plea**

or probation, or any other form of leniency if I plead "GUILTY". I understand that I cannot rely on any promise or suggestion made to me by a government agent or officer which is not stated in writing, or which is not presented to the judge in my presence in open court at the time of the entry of my plea of guilty.

22. My plea of "GUILTY" is not the result of force, threat, or intimidation.

23. I hereby request that the judge accept my plea of "GUILTY" to the following Counts: 1-18.

24. I know that the judge must be satisfied that a crime occurred and that I committed that crime before my plea of "GUILTY" can be accepted. With respect to the charge(s) to which I am pleading guilty, I represent that I did the following acts and that the following facts are true:

>Count 1: Beginning in October 1996 and continuing through October 2001, in the District of Oregon, I knowingly conspired with other defendants to commit the crimes of arson, attempted arson, and damage to or destruction of the property of an energy facility of the United States involved in the transmission and distribution of electricity in an amount exceeding $100,000. In furtherance of the conspiracy, I admit that on or about December 30, 1999, in the District of Oregon, I damaged and attempted to damage the property of an energy facility of the United States, namely, a Bonneville Power Administration tower involved in the transmission and distribution of electricity near

O:\CLIENT\Weinerman\Gerlach\05-60011 Pleadings\plea petition 3.wpd

Bend, Oregon, in an amount exceeding or which would have exceeded $100,000.

Count 2: On or about May 9, 1999, in the District of Oregon, I aided and abetted the malicious damage and destruction, by fire, of a building and other real and personal property used in interstate commerce and in activities affecting interstate commerce at Childers Meat Company in Eugene, Oregon.

Count 3: On or about December 25, 1999, in the District of Oregon, I aided and abetted the malicious damage and destruction, by fire, of a building and other real and personal property used in interstate commerce and in activities affecting interstate commerce at the Boise Cascade office in Monmouth, Oregon.

Count 4: On or about December 30, 1999, in the District of Oregon, I knowingly and willfully damaged and attempted to damage the property of an energy facility of the United States, namely, a Bonneville Power Administration tower, involved in the transmission and distribution of electricity near Bend, Oregon, in an amount exceeding or which would have exceeded $100,000.

Count 5: On or about September 6, 2000, in the District of Oregon, I aided and abetted the malicious damage and destruction, by means of fire, of a building and other real and personal property used in interstate commerce and in activities affecting interstate commerce, at the Eugene Police Department West University Public Safety Station in Eugene, Oregon.

**Page 10 - Petition to Enter Plea of Guilty, Certificate of Counsel, Order Entering Plea**

Count 6: On or about May 21, 2001, in the District of Oregon, I aided and abetted the attempt to damage or destroy by means of fire, a building and other real and personal property used in interstate commerce and used in activities affecting interstate commerce, namely, the main office building and its contents located at Jefferson Poplar Farms in Clatskanie, Oregon.

Count 7: On or about May 21, 2001, in the District of Oregon, I aided and abetted the malicious damage and destruction, by means of fire, of a building and other real and personal property used in interstate commerce and used in activities affecting interstate commerce, namely, a vehicle shop and its contents located at Jefferson Poplar Farms in Clatskanie, Oregon.

Count 8: On or about May 21, 2001, in the District of Oregon, I aided and abetted the malicious damage and destruction, by means of fire, of a building and other real and personal property used in interstate commerce and used in activities affecting interstate commerce, namely, a shop and office building located at Jefferson Poplar Farms in Clatskanie, Oregon.

Count 9: On or about May 21, 2001, in the District of Oregon, I aided and abetted the malicious damage and destruction, by means of fire, of a building and other real and personal property used in interstate commerce and used in activities affecting interstate commerce, namely, a 1997 Ford truck bearing Oregon license No. VHQ 660, located at Jefferson Poplar Farms in Clatskanie, Oregon.

O:\CLIENT\Weinerman\Gerlach\05-60011 Pleadings\plea petition 3.wpd

Count 10: On or about May 21, 2001, in the District of Oregon, I aided and abetted the malicious damage and destruction, by means of fire, of a building and other real and personal property used in interstate commerce and used in activities affecting interstate commerce, namely, a 1984 Ford truck bearing Oregon license No. CXR 901, located at Jefferson Poplar Farms in Clatskanie, Oregon.

Count 11: On or about May 21, 2001, in the District of Oregon, I aided and abetted the malicious damage and destruction, by means of fire, of a building and other real and personal property used in interstate commerce and used in activities affecting interstate commerce, namely, a 1997 Ford truck bearing Oregon license No. VHQ 661, located at Jefferson Poplar Farms in Clatskanie, Oregon.

Count 12: On or about May 21, 2001, in the District of Oregon, I aided and abetted the malicious damage and destruction, by means of fire, of a building and other real and personal property used in interstate commerce and used in activities affecting interstate commerce, namely, a 1997 Ford truck bearing Oregon license No. VNS 404, located at Jefferson Poplar Farms in Clatskanie, Oregon.

Count 13: On or about May 21, 2001, in the District of Oregon, I aided and abetted the malicious damage and destruction, by means of fire, of a building and other real and personal property used in interstate commerce and used in activities affecting interstate commerce, namely, a 1996 Ford truck bearing Oregon license No.

O:\CLIENT\Weinerman\Gerlach\05-60011 Pleadings\plea petition 3.wpd

UMZ 923, located at Jefferson Poplar Farms in Clatskanie, Oregon.

Count 14: On or about May 21, 2001, in the District of Oregon, I aided and abetted the malicious damage and destruction, by means of fire, of a building and other real and personal property used in interstate commerce and used in activities affecting interstate commerce, namely, a 1990 Ford truck bearing Oregon license No. 283 ACE, located at Jefferson Poplar Farms in Clatskanie, Oregon.

Count 15: On or about May 21, 2001, in the District of Oregon, I aided and abetted the malicious damage and destruction, by means of fire, of a building and other real and personal property used in interstate commerce and used in activities affecting interstate commerce, namely, a 1990 Ford truck bearing Oregon license No. 282 ACE, located at Jefferson Poplar Farms in Clatskanie, Oregon.

Count 16: On or about May 21, 2001, in the District of Oregon, I aided and abetted the malicious damage and destruction, by means of fire, of a building and other real and personal property used in interstate commerce and used in activities affecting interstate commerce, namely, a 1990 Ford truck bearing Oregon license No. 361 ACC, located at Jefferson Poplar Farms in Clatskanie, Oregon.

Count 17: On or about May 21, 2001, in the District of Oregon, I aided and abetted the malicious damage and destruction, by means of fire, of a building and other real and personal property used in interstate commerce and used in

activities affecting interstate commerce, namely, a 1981 GMC truck bearing Oregon license No. NA41574, located at Jefferson Poplar Farms in Clatskanie, Oregon.

Count 18: On or about May 21, 2001, in the District of Oregon, I aided and abetted the malicious damage and destruction, by means of fire, of a building and other real and personal property used in interstate commerce and used in activities affecting interstate commerce, namely, a 1989 Ford truck bearing Oregon license No. PWV 249, located at Jefferson Poplar Farms in Clatskanie, Oregon.

25. I offer my plea of "GUILTY" freely and voluntarily and of my own accord and with a full understanding of the allegations set forth in the Indictment or Information, and with a full understanding of the statements set forth in this Petition and in the Certificate of my attorney that is attached to this Petition.

SIGNED by me in the presence of my attorney, after reading (or having had read to me) all of the foregoing pages and paragraphs of this Petition on this 17 day of July, 2006.

Chelsea Dawn Gerlach
Defendant

**Page 14 -** **Petition to Enter Plea of Guilty, Certificate of Counsel, Order Entering Plea**

O:\CLIENT\Weinerman\Gerlach\05-60011 Pleadings\plea petition 3.wpd

## CERTIFICATE OF COUNSEL

The undersigned, as attorney for defendant Chelsea Dawn Gerlach, hereby certifies:

1.      I have fully explained to the defendant the allegations contained in the Indictment or Information in this case, any lesser-included offense(s), and the possible defenses which may apply in this case.

2.      I have personally examined the attached Petition To Enter Plea of Guilty And Order Entering Plea, explained all its provisions to the defendant, and discussed fully with the defendant all matters described and referred to in the Petition.

3.      I have explained to the defendant the maximum penalty and other consequences of entering a plea of guilty described in paragraphs (6)-(20) of the Petition, and I have also explained to the defendant the applicable Federal Sentencing Guidelines.

4.      I recommend that the Court accept the defendant's plea of "GUILTY."

SIGNED by me in the presence of the above-named defendant, and after full discussion with the defendant of the contents of the Petition To Enter Plea of Guilty, and any Plea Agreement, on this _20_ day of July, 2006.


_____
Craig E. Weinerman
Attorney for Defendant

# ORDER ENTERING PLEA

I find that the defendant's plea of GUILTY has been made freely and voluntarily and not out of ignorance, fear, inadvertence, or coercion. I further find the defendant has admitted facts that prove each of the necessary elements of the crime(s) to which the defendant has pled guilty.

IT IS THEREFORE ORDERED that the defendant's plea of GUILTY be accepted and entered as requested in this Petition and as recommended in the Certificate of defendant's attorney.

DATED this _21_ of July, 2006, in open court.

_Ann Aiken_

Ann Aiken
U.S. District Court Judge



**U.S. Department of Justice**
*Karin J. Immergut*
*United States Attorney*
*District of Oregon*
*701 High Street*                    *Office: (541)465-6771*
*Eugene, OR  97401-2798*              *Fax: (541) 465-6582*

July 19, 2006

Mr. Craig E. Weinerman
Assistant Federal Public Defender
151 West 7th Avenue, Suite 510
Eugene, Oregon 97401

Mr. Patrick J. Ehlers
Assistant Federal Public Defender
101 S.W. Main Street, Suite 1700
Portland, Oregon 97204

      Re:    <u>United States v. Chelsea Dawn Gerlach</u>     Case No. CR 06-60079-1-AA
               Plea Agreement  - **REDACTED VERSION**

Dear Counsel:

1.   **Parties/Scope**:  This plea agreement is between this United States Attorney's Office for the District of Oregon (USAO) and defendant, and thus does not bind any other federal, state, or local prosecuting, administrative, or regulatory authority except as otherwise identified in this agreement.   This agreement does not apply to any charges other than those specifically mentioned herein.

2.   **Charges and Penalties**:  Defendant agrees to plead guilty to Counts 1 through 18 of the Information as follows:

   **Count 1: Conspiracy to Commit Arson and Destruction of an Energy Facility of the United States** in violation of Title 18, United States Code, Section 371.  The maximum sentence is 5 years imprisonment, a fine of $250,000, a 2 to 3 year  period of supervised release and a mandatory $100 fee assessment.

   **Count 2: Arson – Childers Meat Company** in violation of Title 18, United States Code, Section 844(i).  The maximum sentence is 20 years imprisonment, a mandatory minimum of 5 years, a fine of $250,000, a 2 to 3 year period of supervised release and a mandatory $100 fee assessment.

   **Count 3: Arson – Boise Cascade Office**, in violation of Title 18, United States Code, Section 844(i). The maximum sentence is 20 years imprisonment, a mandatory minimum of 5 years, a fine of $250,000, a 2 to 3 year period of supervised release and a mandatory $100 fee assessment.

   **Count 4: Destruction of an Energy Facility - BPA Tower**, in violation of Title 18, United States Code, Section 1366(a). The maximum sentence is 20 years imprisonment, a fine of $250,000, a 2 to 3 year period of supervised release and a

mandatory $100 fee assessment.

**Count 5: Arson – EPD Public Safety Station**, in violation of Title 18, United States Code, Section 844(i). The maximum sentence is 20 years imprisonment, a mandatory minimum of 5 years, a fine of $250,000, a 2 to 3 year period of supervised release and a mandatory $100 fee assessment.

**Count 6: Arson – Attempted Arson – Jefferson Poplar Farm Main Office**, in violation of Title 18, United States Code, Section 844(i). The maximum sentence is 20 years imprisonment, a mandatory minimum of 5 years, a fine of $250,000, a 2 to 3 year period of supervised release and a mandatory $100 fee assessment.

**Counts 7 through 18: Arson – Jefferson Poplar Farm Vehicle Shop, Shop and Office and Vehicles**, in violation of Title 18, United States Code, Section 844(i). The maximum sentence is 20 years imprisonment, a mandatory minimum of 5 years, a fine of $250,000, a 2 to 3 year period of supervised release and a mandatory $100 fee assessment for each count.

Defendant agrees to pay the fee assessment applicable to each of the above counts by the time of entry of guilty plea or explain to the court why this cannot be done. Defendant will pay mandatory restitution as ordered by the court.

3.    **Factual Basis**:    The factual basis for each count is attached hereto and by this reference incorporated herein as Attachment 1, which defendant agrees the USAO can prove beyond a reasonable doubt.

4.    **Dismissal/No Prosecution**:    The USAO will move to dismiss all remaining charges at the time of sentencing.    The USAO further agrees not to bring additional charges against defendant for offenses relating to arson, conspiracy, conspiracy to commit arson, or destruction of an energy facility in which defendant may have been involved directly or indirectly up to and including December 11, 2005, which took place in the District of Oregon.

5.    **Resolution of Sentencing Issues**: In addition to waiving the right to a jury trial on the issue of guilt, defendant knowingly and voluntarily agrees that sentencing issues in this case need not be alleged in a grand jury indictment, proven to a trial jury, or proven beyond a reasonable doubt.    Defendant also knowingly and voluntarily consents to judicial fact-finding and resolution of any and all sentencing issues.    Defendant and government agree that the guidelines calculations should be derived from the United States Sentencing Commission Guidelines Manual with effective date of November 1, 2000 and further that the combined offense level for defendant requires a 5 level increase pursuant to §3D1.4 of that manual. The defendant and government understand and agree that the court will consider 18 U.S.C. §3553(a) in determining the

appropriate sentence in this case.

6.   **Guideline Enhancement**: The USAO will recommend the terrorism guideline enhancement found in U.S.S.G. §3A1.4 because the felony offenses either involved or were intended to promote a federal crime of terrorism.

7.   **Acceptance**:  The USAO agrees to recommend a 3 level reduction for acceptance of responsibility if defendant's offense level is 16 or greater; otherwise a 2 level reduction applies pursuant to U.S.S.G. §3E1.1.  The USAO reserves the right to change or omit this recommendation if defendant, between plea and sentencing, commits any new or additional violation of law, obstructs or attempts to obstruct justice or acts inconsistently with acceptance of responsibility.

8.   **REDACTED**

9.   **District of Colorado**: The defendant agrees to the transfer of the charges pending against her in <u>United States v. Gerlach et al.</u>, Case No. 06-CR-00191-REB, from the District of Colorado to the District of Oregon and to plead guilty to each count of the indictment in that case as follows:

**Count 1: Arson – Two Elk Lodge, Vail Ski Area** in violation of Title 18, United States Code, Section 844(i).  The maximum sentence is 20 years imprisonment, a mandatory minimum of 5 years, a fine of $250,000, a 2 to 3 year period of supervised release and a mandatory $100 fee assessment.

**Count 2: Arson – Camp 1 Restaurant, Vail Ski Area** in violation of Title 18, United States Code, Section 844(i).  The maximum sentence is 20 years imprisonment, a mandatory minimum of 5 years, a fine of $250,000, a 2 to 3 year period of supervised release and a mandatory $100 fee assessment.

**Count 3: Arson – Ski Patrol Office and Operator's Shack for Ski Lift 14, Vail Ski Area** in violation of Title 18, United States Code, Section 844(i).  The maximum sentence is 20 years imprisonment, a mandatory minimum of 5 years, a fine of $250,000, a 2 to 3 year period of supervised release and a mandatory $100 fee assessment.

**Count 4: Arson – Ski Patrol Headquarters and Ski Rental Shop, Vail Ski Area** in violation of Title 18, United States Code, Section 844(i).  The maximum sentence is 20 years imprisonment, a mandatory minimum of 5 years, a fine of $250,000, a 2 to 3 year period of supervised release and a mandatory $100 fee assessment.

**Count 5: Arson – Buffalo's Café Building, Vail Ski Area** in violation of Title 18, United States Code, Section 844(i).  The maximum sentence is 20 years imprisonment,

a mandatory minimum of 5 years, a fine of $250,000, a 2 to 3 year period of supervised release and a mandatory $100 fee assessment.

**Count 6: Arson – Operator's Shack for Ski Lift 4, Vail Ski Area** in violation of Title 18, United States Code, Section 844(i). The maximum sentence is 20 years imprisonment, a mandatory minimum of 5 years, a fine of $250,000, a 2 to 3 year period of supervised release and a mandatory $100 fee assessment.

**Count 7: Arson – Operator's Shack for Ski Lift 5, Vail Ski Area** in violation of Title 18, United States Code, Section 844(i). The maximum sentence is 20 years imprisonment, a mandatory minimum of 5 years, a fine of $250,000, a 2 to 3 year period of supervised release and a mandatory $100 fee assessment.

**Count 8: Arson – Operator's Shack for Ski Lift 11, Vail Ski Area** in violation of Title 18, United States Code, Section 844(i). The maximum sentence is 20 years imprisonment, a mandatory minimum of 5 years, a fine of $250,000, a 2 to 3 year period of supervised release and a mandatory $100 fee assessment.

10. **USAO Sentence Recommendation**: The sentence to be recommended by the government in this case is based on the nature and circumstances of the offense and the history and characteristics of the defendant; the need for the sentence to reflect the seriousness of the offense, to promote respect for the law and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and to provide a just and fair sentence for this defendant in relation to and in comparison with all of the defendant's co-conspirators.

11. **Waiver of Appeal/Post-Conviction Relief**: Defendant knowingly and voluntarily waives the right to appeal from any aspect of the conviction and sentence on any grounds unless the sentence imposed exceeds the statutory maximum, the court imposes an upward departure pursuant to Part 5K of the Sentencing Guidelines, or the court exercises its discretion under 18 U.S.C. § 3553(a) to impose a sentence which exceeds the advisory guideline range. Should defendant seek an appeal, despite this waiver of that right, the USAO may take any position on any issue on appeal. Defendant also waives the right to file a motion pursuant to 28 U.S.C. § 2255 to set aside the conviction and sentence, except on grounds of ineffective assistance of counsel, newly discovered evidence, or a retroactive change in the applicable guidelines or statute.

12. **Court Not Bound**: The court is not bound by the recommendations of the parties or of the Presentence Report (PSR) writer. Because this agreement is made under Rule 11(c)(1)(B) of the Federal Rules of Criminal Procedure, defendant may not withdraw any guilty plea or rescind this plea agreement if the court does not follow the

agreements or recommendations herein.

13. **Full Disclosure/Reservation of Rights**: The USAO will fully inform the PSR writer and the court of the facts and law related to defendant's case. Except as set forth in this agreement, the parties reserve all other rights to make sentencing recommendations and to respond to motions and arguments by the opposition.

14. **Breach of Plea Agreement**: If defendant breaches the terms of this agreement, or commits any new violations of law between signing this agreement and sentencing, the USAO is relieved of its obligations under this agreement, but defendant may not withdraw any guilty plea.

15. **REDACTED**

16. **REDACTED**

17. **Abandonment of Firearms**: By signing this agreement, defendant hereby voluntarily abandons all right, title and interest to the firearms listed as follows: 1) Norinco rifle, model MAK 90, caliber 7.62x39, serial number 9445958, importer Compasseco Inc. Bardstown, KY; 2) Norinco rifle, model MAK 90, caliber 7.62x39, serial number 9376989, importer Interstate Arms Corp, Billerica, MA; 3) Ruger rifle, model Mini-14, caliber .223, serial number 184-38099; 4) Keltec pistol, model P40, caliber .40, serial number 55242; 5) Glock pistol, model 22, caliber .40, serial number CML333US, importer Glock Inc, Smyrna, GA; and 6) Glock pistol, model 19, caliber 9mm, serial number ADT277US, importer Glock Inc, Smyrna, GA.

18. **Total Agreement**: This letter states the full extent of the agreement between the parties. There are no other promises or agreements, express or implied. If defendant accepts this offer, please sign and attach the original of this letter to the Petition to Enter Plea.

Sincerely,

KARIN J. IMMERGUT
United States Attorney

KIRK A. ENGDALL
Assistant U.S. Attorney

I have read this agreement carefully and reviewed every part of it with my attorney. I understand the agreement and voluntarily agree to it. I am satisfied with the legal assistance provided to me by my attorney.

_____                           _____

Date                                      CHELSEA DAWN GERLACH
                                          Defendant


I represent defendant as legal counsel. I have carefully reviewed every part of this agreement with defendant. To my knowledge defendant's decision to enter into this agreement is an informed and voluntary one.

_____                           _____

Date                                      CRAIG E. WEINERMAN
                                          Attorney for Defendant

_____                           _____

Date                                      PATRICK J. EHLERS
                                          Attorney for Defendant

United States vs. Chelsea Dawn Gerlach

**Count 1: Conspiracy to Commit Arson and Destruction of an Energy Facility of the United States:**

Beginning in October, 1996, and continuing through October 1, 2001, in the District of Oregon and elsewhere, Josephine Sunshine Overaker, Kevin Tubbs, Stanislas Gregory Meyerhoff, Daniel Gerard McGowan, Joseph Dibee, Rebecca Rubin, Chelsea Dawn Gerlach, Kendall Tankersley, Suzanne Savoie, Jonathan Christopher Mark Paul, Darren Todd Thurston, Nathan Fraser Block, Joyanna L. Zacher, Jacob Jeremiah Ferguson, Jennifer Lynn Kolar, William C. Rodgers and other persons, willfully and knowingly conspired and agreed to maliciously damage or destroy, or attempt to damage or destroy, by means of fire, buildings vehicles and other personal and real property owned in whole or in part or possessed by, or leased to, the United States or any department or agency thereof, and or used in interstate commerce or in any activity affecting interstate commerce; and to knowingly and willfully damage and attempt to damage the property of an energy facility of the United States involved in the transmission of electricity.

The conspiracy was accomplished by the defendant and the others named above, when certain of the defendants and others joined together in a group they called the "Family." This "Family" was what is commonly known as a "cell" of groups and movements publicly named and described by certain of the defendants and others as the Earth Liberation Front (ELF), the Animal Liberation Front (ALF), and other names.

The primary purposes of the conspiracy were to influence and affect the conduct of government, commerce, private business and others in the civilian population by means of force, violence, sabotage, destruction of property, intimidation and coercion, and by similar means to retaliate against the conduct of government, commerce and private business. To achieve these purposes, some of the conspirators committed and attempted to commit acts potentially dangerous to human life and property that constituted violations of the criminal laws of the United States and of individual states.

Some of the defendants and others targeted for arson, buildings, vehicles and other real and personal property owned, possessed, and leased by the United States and its departments and agencies while others targeted for arson, buildings, vehicles and other real and personal property used in interstate commerce and in activities affecting interstate commerce; and still others targeted energy facilities of the United States for damage and destruction.

The defendant and others conducted and participated in meetings to plan arsons of the targeted sites. Several of these meetings were called "Book Club" meetings by the defendants and others and occurred at distant locations. The "Book Club" meetings covered subjects such as lock-picking, computer security, reconnaissance of targets,

and manufacture of timing devices to set off improvised incendiary devices.

Some of the defendants and others conducted research and surveillance of sites targeted for arson and discussed their actions among themselves by using code words, code names, and nicknames. The phrase "direct action" was used to include arsons and other acts of destruction.

In preparation for the actions, the conspirators designed and constructed destructive devices which functioned as incendiary devices to ignite fires and destroy the targets for arson and provided transportation to the locations of the arson targets.

During the course of the "direct actions" the defendant and others dressed in dark clothing, wore masks and gloves and otherwise disguised their appearance. Some of the conspirators acted as "lookouts" to ensure secrecy as the crimes were carried out, and some placed destructive devices and accelerants at sites targeted for arson and ignited or attempted to ignite the devices and accelerants.

In some of the arsons and attempted arsons, certain of the defendants and others painted messages on the walls of the targets, including "Earth Liberation Front," "ELF" and related names and statements concerning the purposes of the crimes.

After the arsons and attempted arsons, the defendants and others destroyed, buried, hid and otherwise disposed of physical evidence used in the commission of the crimes and thereafter publicized and promoted the results of the fires by means of written press releases and communiques which attributed the arsons to the Earth Liberation Front (ELF), the Animal Liberation Front (ALF) and related groups, and stated the purpose of the arsons.

Before, during and after the arsons, attempted arsons, and destruction of an energy facility, some of the defendants and others agreed among themselves never to reveal to law enforcement authorities or to anyone else outside "the Family" the identity of the conspirators and participants in the arsons and attempted arsons and agreed among themselves to conceal or destroy any evidence connecting them to the arsons and attempted arsons. Some of the defendants and others possessed and/or used false identification documents in order to conceal their true identities and after the arsons and attempted arsons, some of the defendants and others fled and secreted themselves in foreign countries in order to avoid detection and arrest by law enforcement authorities in the United States.

**Count 2: Arson – Childers Meat Company**

Prior to May 9, 1999, Chelsea Dawn Gerlach and Stanislas Meyerhoff were asked to participate in an arson at the Childers Meat Company at 29476 Airport Road, Eugene, in the District of Oregon. Gerlach, Meyerhoff and Kevin Tubbs drove to Childers Meat Company and performed a reconnaissance of that facility. On the night of the arson, May 9, 1999, Gerlach, Meyerhoff, Tubbs, Jacob Ferguson, Josephine

Sunshine Overaker and another met at a location in the city of Eugene to discuss the arson. Gerlach and Meyerhoff were chosen to be lookouts. Tubbs drove a van named "Betty" and transported Gerlach, Meyerhoff, Ferguson, Overaker and another person to the Childers Meat Company facility. Gerlach, Meyerhoff and the others had two-way radios with which to communicate among themselves during the arson. Once at the location, Gerlach and Meyerhoff were dropped off as the lookouts while Ferguson, Overaker and the other person placed the incendiary devices in and around the building. Once the devices were placed, Tubbs picked everyone up and they left the area. The incendiary devices functioned and the Childers Meat Company building was destroyed by fire. The Childers Meat Company building and other real and personal property was used in interstate commerce and in activities affecting interstate commerce. After the fire, a communique was written and then typewritten. A stencil was used to address the envelopes which contained the communique. Gerlach sent the communique through the United States Postal Service.

## Count 3: Arson – Boise Cascade Office

Prior to December 25, 1999, Chelsea Dawn Gerlach performed research on Boise Cascade and discovered that Boise Cascade Corporation was involved in a logging controversy. The night of the arson, December 25, 1999, Gerlach, Stanislas Meyerhoff, Jacob Ferguson and Josephine Sunshine Overaker traveled to the Boise Cascade Office facility at 450 North Pacific Avenue, Monmouth, Polk County, in the District of Oregon, in a van they had named "Betty." They parked the van on a street behind the office building and while Gerlach stayed with the van as a lookout, and Overaker took a position on Highway 99 as a lookout, Ferguson and Meyerhoff placed the incendiary devices near the building. Once the incendiary devices were placed, all four left the area. The incendiary devices functioned and the Boise Cascade Office building was destroyed by fire. The Boise Cascade building and other real and personal property were used in interstate commerce and in activities affecting interstate commerce. After the arson, Gerlach sent out the communique claiming responsibility for the fire.

## Count 4: Arson – Destruction of an Energy Facility - BPA Tower

Prior to December 30, 1999, Chelsea Dawn Gerlach was advised by William Rodgers that it would be a good idea to disrupt electric power for Y2K. Gerlach went to the University of Oregon and located maps of the power grid for the region. Gerlach identified several major high voltage transmission lines and located some which had road access which were just east of Bend, Oregon. Gerlach and Stanislas Gregory Meyerhoff and traveled to the location east of Bend, Oregon, to perform reconnaissance at the location of the high voltage electric transmission lines. Later, Gerlach and Meyerhoff discussed plans with Jacob Ferguson and Josephine Sunshine Overaker of loosening the bolts which hold up the towers. On the night of the destruction of the energy lines, December 30, 1999, and after preparations had been made by Meyerhoff, Gerlach, Ferguson and Overaker, they drove in Gerlach's truck to a site east of Bend, Oregon. After parking on a dirt road just off the highway,

Meyerhoff, Ferguson and Overaker walked to the site of the transmission tower. Gerlach remained with her vehicle and waited for the three to return. Gerlach observed a large blue spark at the location of the fallen tower and saw Ferguson, Meyerhoff and Overaker running back toward her location. After all four were back together at the truck, they returned to Eugene, Oregon. After the action, they disposed of the tools which they used to loosen the tower bolts. Gerlach purchased new tires for her truck because of the possibility that they may have left tire tracks near the location of the downed tower. There was no communique written because the conspirators did not want to link the action with the Earth Liberation Front. The high voltage transmission tower was the property of an energy facility of the Untied States, namely, a Bonneville Power Administration tower, involved in the transmission and distribution of electricity near the City of Bend, Oregon, in an amount exceeding or which would have exceeded $100,000.

## Count 5: Arson – EPD Public Safety Station

Prior to September 9, 2000, Chelsea Dawn Gerlach and Stanislas Meyerhoff discussed the West University Pubic Safety Station at 791 East 13th Avenue, Eugene, Lane County, in the District of Oregon, as a target for arson because they believed it would be a popular target with the Eugene activist community. Gerlach assisted Meyerhoff in assembling the timing devices used at the arson. The assembly of the timing devices was done in a motel room in Salem, Oregon. Gerlach and Meyerhoff rented a room under a false name. To construct the timing devices, Gerlach and Meyerhoff wore painter's suits, hair nets and two to three pairs of gloves so as to avoid leaving any trace evidence on the devices which may later be detected by law enforcement. The night of the arson, September 9, 2000, Gerlach, Meyerhoff and Kevin Tubbs traveled to a location at East 28th and Alder Streets in Eugene, Oregon. At that location they all dressed in dark clothing. Tubbs and Meyerhoff rode bicycles to the location of the West University Public Safety Station. Gerlach had a backpack which contained an incendiary device while Meyerhoff had an incendiary device attached to the back of his bicycle. Gerlach was in an alley north of the building while Tubbs was a lookout on the south side of the building. At the appropriate moment, Gerlach and Tubbs radioed Meyerhoff that it was "clear" and Meyerhoff placed his bicycle with the incendiary device against the side of the building and walked away. Gerlach walked over to the building and placed her backpack with the incendiary device next to the building. She in turn walked away and returned to the location of the vehicle. She later heard the news that the incendiary device on the bicycle initiated but that the incendiary device in her backpack had failed to function. After the arson, Gerlach and the others disposed of their dark clothing. Gerlach, Meyerhoff and Tubbs decided not to issue a communique because there was no damage to the building. The West University Public Safety Station building and other real and personal property were used in interstate commerce and in activities affecting interstate commerce.

## Counts 6 through 18: Arson – Attempted Arson – Jefferson Poplar Farm

Prior to May 21, 2001, Chelsea Dawn Gerlach and another did research on

Jefferson Poplar Farm and the University of Washington. Gerlach attended meetings to discuss the Tree Genetic Engineering Research cooperative. Gerlach identified James River Corporation as being a member of the cooperative and that it had a facility in Clatskanie, Oregon. Gerlach, Stanislas Meyerhoff and Daniel McGowan performed a reconnaissance at the Jefferson Poplar Farm in Clatskanie, Oregon. Gerlach agreed to send a communique after the arsons at Jefferson Poplar Farm and at the University of Washington. Others associated with Gerlach completed the arson at Jefferson Poplar Farm and the facilities there were destroyed by fire. The Jefferson Poplar Farm buildings, vehicles and other real and personal property were used in interstate commerce and in activities affecting interstate commerce. After the arson, Gerlach sent out the communique claiming responsibility for the fires.

**District of Colorado Case No. 06-CR-00191-REB**

Sometime in the Fall of 1998, while the defendants Chelsea Gerlach and Stanislas Meyerhoff were living near Fall Creek, Oregon, William Rodgers asked them to participate in the commission of arson at the Vail ski area in Colorado.

The ski area is located on Vail Mountain in Eagle County, Colorado, adjacent to and south of the Town of Vail. Ski lifts run from the bottom of the mountain to its top.

Meyerhoff and Gerlach agreed to join Rodgers and drove to Colorado in Gerlach's truck. Rodgers and another person drove in his truck. They bought gasoline and other supplies during the trip and spent time at a motel in Utah constructing devices that they planned to use to ignite the fires.

When they arrived in Colorado, Gerlach, Meyerhoff, Rodgers and the other person met some others who planned to assist with the arson. Gerlach, Meyerhoff, Rodgers and others drove in Gerlach's truck from the City of Vail toward the top of Vail Mountain. They brought along several containers of gasoline and diesel fuel, which they intended to use to burn buildings and other structures belonging to the ski resort at the top of the mountain. Because there was snow on the ground and the road was muddy, the truck was unable to get to the top. The group took the containers out of the truck and hid them in an area below the ridge line.

When the group returned to the bottom of the mountain, Meyerhoff quit the project, believing the arson could not be accomplished. He drove back to Oregon in Gerlach's truck. Rodgers and Gerlach were the only ones who stayed in Colorado.

Rodgers and Gerlach decided that she would drive him back to the spot near the top of the mountain where her truck earlier had become stuck in the snow so that he could set fire to buildings and other structures. After accomplishing this task, Rodgers walked down the mountain on the morning of Monday, October 19, 1998, and met Gerlach at a prearranged site in Vail. Gerlach and Rodgers then drove to Denver, Colorado.

The fires that Rodgers had set destroyed or damaged eight buildings and structures in two different locations at the ski area. The two locations, which investigators designated as Scene A and Scene B, are about 1.4 miles apart along a ridge on top of the mountain, at about 11,250 feet.

Scene A contained three burned structures:

1.    Two Elks Lodge, a building of more than 24,000 square feet, which was totally destroyed.

2.    Camp One Restaurant, a 2,900-square-foot, which also was totally destroyed.

3.    A 1,327-square-foot building known as China Bowl, which housed a ski patrol office and an operator's shack for ski lift 14. The building was totally destroyed, but the ski lift itself received little damage.

In the area designated as Scene B, the following structures were damaged or destroyed by fire:

1.    Patrol Headquarters, a 5,390-square-foot, wood-frame building that housed the ski patrol's headquarters as well as a ski rental shop, a pro shop, a small restaurant and an apartment where each season a ski patrol member resided. (The patrol member who was scheduled to live there during the 1998-99 season was in the process of moving into the apartment at the time of the fires but was not present when the fires occurred.) This building was totally destroyed.

2.    Buffalo's Café, a 749-square-foot building, which also was totally destroyed.

3.    A structure at the top of ski lift 5, which carried skiers from a back bowl to a spot near Patrol Headquarters. This lift also provided access to the Category III expansion area. The structure was a complete loss as a result of the fire.

4.    The structure at the top of ski lift 4, which carried skiers on the front side of the mountain to the area of Patrol Headquarters. Fire caused damage to a wall and an attached wooden deck.

5.    The structure at the top of ski lift 11, which also carried skiers on the front side of the mountain. The structure sustained fire damage on its southeast corner.

A forensic chemist examined wood, soil samples and other debris taken from Scene A and Scene B and determined that several items from both scenes contained

mixtures of gasoline and a heavy petroleum distillate. (Diesel fuel is a heavy petroleum distillate.) Investigators determined that the fires were the result of arson.

Vail Associates, Inc., the company that operates the ski area, estimated that the value of the real estate lost as a result of the fires was almost $15,000,000. Vail Associates received a payment of about $12,000,000 from its insurance carrier. All of these buildings and structures that were affected by the arson fires had been used in interstate commerce or in activities affecting interstate commerce.

When Gerlach and Rodgers arrived in Denver, they composed a "communique," which claimed to be from the Earth Liberation Front. On October 21, 1998, Gerlach used a computer at a library in Denver to send the "communique" to news media. It read as follows:

> On behalf of the lynx, five buildings and four ski lifts at Vail were reduced to ashes on the night of Sunday, October 18th. Vail, Inc. is already the largest ski operation in North America and now wants to expand even further. The 12 miles of roads and 885 acres of clearcuts will ruin the last, best lynx habitat in the state. Putting profits before Colorado's wildlife will not be tolerated. This action is just a warning. We will be back if this greedy corporation continues to trespass into wild and unroaded areas. For your safety and convenience, we strongly advise skiers to choose other destinations until Vail cancels its inexcusable plans for expansion.

When the "communique" said the ski area "want[ed] to expand even further," it was referring to Vail Associates' proposed Category III expansion onto 2,000 acres south of the mountain's back bowls. Environmental groups had tried to stop the project by filing a lawsuit in federal court in Denver. The groups claimed that the U.S. Forest Service, in granting a permit for the expansion, had failed to properly analyze the environmental impact of the expansion, including its effects on the Canadian lynx population. The lawsuit was unsuccessful, and the project was scheduled to begin the day after the fires.