In late summer 2001, Dibee and Gerlach performed a reconnaissance of the facility. Gerlach dropped Dibee off near the facility, and he went inside to look around.

Dibee asked Tubbs to assist in the arson at the Litchfield BLM and Tubbs agreed. In October 2001, Dibee and Rubin contacted Thurston via email and asked Thurston to be involved as well. He also agreed.

On October 11, 2001, Thurston and Rubin, both residents of Canada, illegally crossed the United States border near the Cultus Lake region of Canada and were picked up by Dibee and Kolar. They went to Dibee's residence in Seattle where they met Meyerhoff. The five of them then planned the arson of the Litchfield BLM facility. Meyerhoff constructed the incendiary devices at Dibee's residence.

On October 12, 2001, Rubin and Thurston washed Dibee's truck to assure it would have no trace evidence or fingerprints. Dibee purchased a roof rack for carrying equipment, and he and Thurston installed it on top of the truck at Dibee's residence. Rubin and Thurston gathered equipment including backpacks, water bladder bags, flashlights, pepper spray and tools for the crime. In Dibee's residence, Thurston washed the equipment and tools to be used. The washing was to remove any trace evidence and fingerprints. Thurston and Dibee went to Kolar's residence in Seattle, where she gave them sets of "clean" (i.e., DNA and fingerprint-free) maps of the Litchfield area. Dibee and Meyerhoff mixed the fuel at Dibee's residence. Thurston assisted others in loading the fuel on top of Dibee's truck.

On October 13, 2001, Thurston, Rubin and Dibee got in Dibee's truck and Meyerhoff in his car, and they all drove to Olympia, where several more people joined their group. They then drove to Eugene, where Tubbs also joined the group. They all traveled in three vehicles to near

Page 46  -  **Government's Sentencing Memorandum**

the Litchfield BLM corrals and gathered on a large mound overlooking the facility.  Thurston and others tested out Dibee's night-vision scope.  They next drove to an area nearby and camped for the night.

About midnight on October 15, 2001, Thurston and the others dressed in black clothing and gloves, and placed socks over their shoes.  Tubbs, Meyerhoff and Dibee had two-way radios.  Thurston, Rubin, Meyerhoff and others got into Dibee's truck, and Tubbs drove them to the Litchfield facility.  Thurston and Rubin got out of the truck and went to the horse corrals.  They cut and removed parts of the fences.  They used a rope and plastic tarps to try to funnel the horses out of the corrals.

Tubbs drove Kolar, Dibee and Meyerhoff closer to the buildings.  Tubbs acted as a lookout.  Meyerhoff and Kolar placed the incendiary devices, one at a hay building, another on the porch of a building, and one under a vehicle.

After the devices were set up and the horse release completed, Tubbs picked up Thurston and Rubin.  Tubbs then picked up Dibee, Kolar and Meyerhoff.  They stopped on their way home and discussed the contents of the communique.  Thurston got into Dibee's truck and traveled to Olympia, where several people were dropped off.  Dibee, Thurston and Rubin drove back to Dibee's residence in Seattle.

On October 16, 2001, Thurston and Rubin washed Dibee's truck and the roof rack, as well as the equipment used in the crime.  Kolar picked up Thurston and Rubin and drove them to an area near the United States-Canadian border.  Thurston and Rubin then re-crossed the border.

On October 17, 2001, Thurston prepared the final copy of the communique and sent it to several groups, including his own ALF website.  ELF claimed credit for cutting the fence and setting four incendiary devices at the BLM facility.

On October 19, 2001,  Dibee returned the roof rack to the store where he had purchased it.  On October 30, 2001, Thurston posted the communique on the ALF website.  As with the Burns and Rock Springs crimes, the communique criticized BLM policies regarding wild horses, including their "slaughter."  It threatened future targeting of  "industries and organizations that seek to profit by destroying the earth."

### III.  APPLICABLE LAW AND SENTENCING GUIDELINES

**A.**     <u>**Maximum Penalties:**</u>

1.     Conspiracy, 18 U.S.C. § 371:  5 years; $250,000 fine;

2.     Arson or attempted arson, 18 U.S.C. § 844(f) and (i): 20 years with 5 year minimum; $250,000 fine;

3.     Destruction of energy facility, 18 U.S.C. § 1366(a): 20 years; $250,000 fine.

**B.**     <u>**Sentencing Guidelines:**</u>

**1.     Offense Conduct**

**a.  Conspiracy (18 U.S.C. § 371)**

Appendix A (Statutory Index) of the 2000 edition of the United States Sentencing Guidelines Manual (U.S.S.G.) references § 2X1.1 as the applicable guideline section for 18 U.S.C. § 371.  That section provides, in pertinent part, as follows:

Page 48  -  **Government's Sentencing Memorandum**

    (a)    Base offense level: The base offense level from the guideline for the substantive offense, plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty.

    (b)    Special Offense Characteristics:  . . .

        (2)    If a conspiracy, decrease by 3 levels, unless the defendant or a co-conspirator completed all the acts the conspirators believed necessary for successful completion of the substantive offense or the circumstances demonstrate that the person was about to complete all such acts but for apprehension or interruption by some similar event beyond their control.

**b.  Arson (18 U.S.C. §§ 844(f) and (i))**

Appendix A of the guidelines manual references 2K1.4 as the applicable guideline section for 18 U.S.C. §§ 844(f) and (i).  That section provides, in pertinent part, as follows:

    (a)    Base Offense Level (Apply the Greatest):

        (1)    **24**, if the offense (A) created a substantial risk of death or serious bodily injury to any person other than a participant in the offense, and that risk was created knowingly; or (B) involved the destruction or attempted destruction of a dwelling;

        (2)    **20**, if the offense (A) created a substantial risk of death or serious bodily injury to any person other than a participant in the offense; (B) involved the destruction or attempted destruction of a structure other than a dwelling; or (C)  endangered a dwelling, or a structure other than a dwelling; . . . or

        (4)    **2** plus the offense level from §2B1.13 (Property Damage or Destruction).

**c.  Destruction of an Energy Facility (18 U.S.C. § 1366(a))**

Appendix A of the guidelines manual references § 2B1.3 as the applicable guideline section for 18 U.S.C. § 1366(a).  That section provides, in pertinent part, as follows:

Page 49  -  **Government's Sentencing Memorandum**

(a)    Base offense level:  4

(b)    Specific Offense Characteristics:

    (1)    If the loss exceeded $100, increase by the corresponding number of levels from the table in § 2B1.1. . .

    (3)    If the offense involved more than minimal planning, increase by **2** levels.

(c)    Cross Reference

    (1)    If the offense involved arson, or property damage by use of explosives, apply § 2K1.4 (Arson; Property Damage by Use of Explosives).

## 2.    Terrorism Adjustment

All ten defendants' plea agreements specify that the applicable sentencing guidelines are those that went into effect on November 1, 2000.  That version of U.S.S.G. § 3A1.4 provides (as it does in the current version (November 1, 2006)):

### Terrorism

(a)    If the offense is a felony that involved, or was intended to promote, a federal crime of terrorism, increase by **12** levels; but if the resulting offense level is less than level **32**, increase to level **32**.

(b)    In each such case, the defendant's criminal history category from Chapter Four (Criminal History and Criminal Livelihood) shall be Category VI.

This guideline section is applicable to each defendant, and enhances each defendant's offense level to 38VI, calculated as follows:

Page 50  -  **Government's Sentencing Memorandum**