| | | |
|---|---|---|
| 2K1.4: | 2 | (plus the offense levels from 2B1.3) |
| 2B1.3: | 24 | (base offense level of 4 + 18 levels for greater than $20 million, plus 2 for more than minimal planning) |
| 3A1.4: | <u>12</u> | |
| | 38VI | |

This guideline level is, however, subject to other adjustments, which will be discussed separately for each defendant under section IV below.  The terrorism guideline applies because of the following reasoning:

The Commentary applicable to the 2000 version (which is different from the current Commentary) provides:

Application Notes:

1.  Subsection (a) increases the offense level if the offense involved, or was intended to promote a federal crime of terrorism.  "Federal crime of terrorism" is defined at 18 U.S.C. § 2332b(g).

2.  Under subsection (b), if the defendant's criminal history category as determined under Chapter Four (Criminal History and Criminal Livelihood) is less than Category VI, it shall be increased to Category VI.

The version of 18 U.S.C. § 2332b(g) applicable on November 1, 2000, defined what is meant by "federal crime of terrorism":

(5) the term "Federal crime of terrorism" means an offense that–

(A) is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct; and

(B) is a violation of–

(i) section 32 (relating to destruction of aircraft or aircraft facilities), 37 (relating to violence at international airports), 81 (relating to arson within special maritime and territorial jurisdiction), 175 (relating to biological weapons), 351 (relating to congressional, cabinet, and Supreme Court assassination, kidnapping,

and assault), 831 (relating to nuclear materials), 842(m) or (n) (relating to plastic explosives), 844(e) (relating to certain bombings), 844(f) or (i) (relating to arson and bombing of certain property), 930(c), 956 (relating to conspiracy to injure property of a foreign government), 1114 (relating to protection of officers and employees of the United States), 1116 (relating to murder or manslaughter of foreign officials, official guests, or internationally protected persons), 1203 (relating to hostage taking), 1361 (relating to injury of Government property or contracts), 1362 (relating to destruction of communication lines, stations, or systems), 1363 (relating to injury to buildings or property within special maritime and territorial jurisdiction of the United States), 1366 (relating to destruction of an energy facility), 1751 (relating to Presidential and Presidential staff assassination, kidnapping, and assault), 1992, 2152 (relating to injury of fortifications, harbor defenses, or defensive sea areas), 2155 (relating to destruction of national defense materials, premises, or utilities), 2156 (relating to production of defective national defense materials, premises, or utilities), 2280 (relating to violence against maritime navigation), 2281 (relating to violence against maritime fixed platforms), 2332 (relating to certain homicides and other violence against United States nationals occurring outside of the United States), 2332a (relating to use of weapons of mass destruction), 2332b (relating to acts of terrorism transcending national boundaries), 2332c, 2339A (relating to providing material support to terrorists), 2339B (relating to providing material support to terrorist organizations), or 2340A (relating to torture);

   (ii) section 236 (relating to sabotage of nuclear facilities or fuel) of the Atomic Energy Act of 1954 (42 U.S.C. 2284); or

   (iii) section 46502 (relating to aircraft piracy) or section 60123(b) (relating to destruction of interstate gas or hazardous liquid pipeline facility) of title 49.

  The government's position is that the terrorism enhancement of § 3A1.4 applies to all ten defendants because each of them committed one or more federal crimes of terrorism, in terms of their substantive crimes as well as their § 371 conspiracy. Discussion of this issue requires examination of the history of U.S.S.G. § 3A1.4, the applicable case law, and application to individual offenses and defendants before the court.

a.    History of U.S.S.G. § 3A1.4

Prior to 1994, the main sentencing provision that related to terrorism offenses was a policy statement in U.S.S.G. § 5K2.15 (November 1, 1989), which originally read, "If the defendant committed the offense in furtherance of a terroristic action, the court may increase the sentence above the authorized guideline range."  The terms "terrorism" and "terroristic action" were not defined, but the amendment promulgating the section noted the purpose "concerning consideration of an upward departure."  See U.S.S.G.  App. C, Amend. 292 (1989).

This policy statement remained until 1994, when Congress passed the Violent Crime Control and Law Enforcement Act of 1994 (VCCA), Pub. L. 103-322 (1994).  Section 120004 of that act directed the Sentencing Commission to:

> amend its sentencing guidelines to provide an appropriate enhancement for any felony, whether committed within or outside the United States, that involves or is intended to promote international terrorism, unless such involvement or intent is itself an element of the crime.

Pub. L. 103-322 § 120004 (1994).

The Commission gave effect to this requirement by deleting the upward departure policy statement at § 5K2.15 and by promulgating the first version of § 3A1.4 (effective on November 1, 1995) which provided in pertinent part:

> (a)  If the offense is a felony that involved, or was intended to promote, international terrorism, increase by 12 levels; but if the resulting offense level is less than level 32, increase to level 32.

> (b)  In each such case, the defendant's criminal history category from Chapter Four (Criminal History and Criminal Livelihood) shall be Category VI.

Application Notes:

1.  Subsection (a) increases the offense level if the offense involved, or was intended to promote, international terrorism.  "International terrorism" is defined at 18 U.S.C. § 2331.

See U.S.S.G. App. C, Amend. 526 (1994).

Section 3A1.4 was amended shortly thereafter by the Antiterrorism and Effective

Death Penalty Act of 1996 (AEDPA), Pub. L. 104-132 (1996).  Section 730 of AEDPA stated:

The United States Sentencing Commission shall forthwith, in accordance with the procedures set forth in section 21(a) of the Sentencing Act of 1987 . . . amend the sentencing guidelines so that the chapter 3 adjustment relating to international terrorism only applies to Federal crimes of terrorism, as defined in section 2332b(g) of title 18, United States Code.

Accordingly, the Commission promulgated an emergency amendment,

Amendment 539.  The commentary to that amendment stated:

This amendment implements section 730 of the Antiterrorism and Effective Death Penalty Act of 1996.  That section requires the Commission to amend the sentencing guidelines so that the adjustment in § 3A1.4 (relating to international terrorism) applies more broadly to a "Federal crime of terrorism," as defined in 18 U.S.C. § 2332b(g), and provides that the Commission shall have the authority to promulgate this amendment as an emergency amendment under procedures set forth in section 21(a) of the Sentencing Act of 1987. . . .

U.S.S.G. App. C, Amend. 539 (citations omitted).

Amendment 539 was re-promulgated without change, effective November 1,

1997.  See U.S.S.G. App. C, Amend. 565.  Under the Amendment, the term "international

terrorism" was replaced with the term "federal crime of terrorism."  The amended § 3A1.4 is the

same

version quoted above that was in effect on November 1, 2000, and is the applicable version for this case by virtue of the plea agreement.[8]

        b.    <u>Applicable Case Law</u>

Several court decisions have interpreted § 3A1.4 in ways favorable to the government's position here. As noted, the guideline was broadened in 1996 to make it equally applicable to domestic as to international terrorism, subject to the narrow statutory definition of "federal crime of terrorism." As the court held in *United States v. Harris*, 434 F.3d 767, 773 (5th Cir. 2005), *cert. denied*, 126 S. Ct. 1897 (2006) (footnote omitted), the definition of "federal crime of terrorism" in 18 U.S.C. § 2332b(g)(5)

> encompasses many offenses, none of which has as an element requiring conduct transcending national boundaries. All that section 3A1.4 requires for an upward adjustment is that one of the enumerated offenses was " calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct."

In *Harris* the court upheld consecutive sentences of 240 and 120 months for arson of a municipal building with a Molotov cocktail, a domestic terrorism crime. *United States v. Dowell*, 430 F.3d 1100 (10th Cir. 2005), *cert. denied*, 127 S. Ct. 44 (2006), involved a 360-month sentence for the arson of an Internal Revenue Service office, purely a domestic act of terrorism. Defendant in *United States v. Graham*, 275 F.3d 490 (6th Cir. 2001), *cert. denied*, 535 U.S. 1026 (2002), received a 55-year sentence, affirmed on appeal, for numerous offenses, including plans to attack domestic government sites. *United States v. Hale*, 448 F.3d 971 (7th Cir. 2006), *cert. denied*, 127 S. Ct. 1020 (2007), upheld a domestic terrorism enhancement to

---

[8] The current version of § 3A1.4 is identical to the 2000 version, except the former has a more extensive commentary, which is discussed *infra*. See U.S.S.G. App. C, Amend. 637 (November 1, 2002).

480 months for involvement in a plot to murder a federal judge.  In one of the most notorious

domestic terrorism cases, the 1996 Oklahoma City bombing, the Tenth Circuit noted that, but for

ex post facto concerns, Terry Nichols "no doubt" would have been subject to the terrorism

enhancement, even with no international connections.  *United States v. Nichols*, 169 F.3d 1255,

1270 n.3 (10th Cir. 1999).[9]

Section 3A1.4 applies if the felony offense "involved, or was intended to

promote, a federal crime of terrorism," as defined in 18 U.S.C. § 2332b(g)(5).  Because of this

language, phrased in the conjunctive, courts have applied § 3A1.4 where a defendant was not

convicted of a substantive offense enumerated in § 2332b(g)(5).  This is because the guideline

includes an offense either involving <u>or</u> intending to promote a federal crime of terrorism.

In *United States v. Graham*, 275 F.3d at 517 (footnote omitted), the Sixth Circuit

held:

> Based on our interpretation of the word "involved" and the phrase
> "intended to promote," as well as our understanding of the relevant
> conduct provision, we believe that this statement of law is correct:
> the defendant need not have been convicted of a federal crime of
> terrorism as defined in 18 U.S.C. § 2332b(g)(5) for the district court to
> find that he intended his substantive offense of conviction or his relevant
> conduct to promote such a terrorism crime.  In sentencing the defendant
> under § 3A1.4, we hold that the district court must, however, identify
> which enumerated "Federal crime of terrorism" the defendant intended
> to promote, satisfy the elements of § 2332b(g)(5)(A), and support its
> conclusions by a preponderance of the evidence with facts from the record.

---

[9]  But see *United States v. Salim*, 287 F. Supp. 2d 250, 330-54 (S.D.N.Y. 2003)
(concluding that §3A1.4 may not apply to purely domestic activities).

Specifically, *Graham* approved the application of the terrorism guideline to the general conspiracy statute, 18 U.S.C. § 371, as long as the conspiracy was "intended to promote" one or more of the federal crimes of terrorism listed in 18 U.S.C. § 2332b(g)(5)(B).

   To the same effect are *United States v. Mandhai*, 375 F.3d 1243 (11th Cir. 2004) ("the terrorism enhancement does not hinge upon a defendant's ability to carry out specific terrorist crimes or the degree of separation from their actual implementation.  Rather, it is the defendant's purpose that is relevant, and if that purpose is to promote a terrorism crime, the enhancement is triggered"); *United States v. Arnaout*, 431 F.3d 994, 1002 (7th Cir. 2005) ("§ 3A1.4 must be considered when a defendant is convicted of a federal crime of terrorism as defined by 18 U.S.C. § 2332b(g)(5)(B) or when a defendant's felony conviction or relevant conduct has as one purpose the intent to promote a federal crime of terrorism"); and *United States v. Hale*, 448 F.3d at 988 (citing *Arnaout*, *Mandhai*, and *Graham*, and holding, "[t]hat Hale did not commit a federal crime of terrorism is irrelevant; the district court found that the purpose of his soliciting Evoloa was <u>to promote</u> a federal crime of terrorism – the murder of a federal officer or employee").

   As the Eleventh Circuit stated in *Mandhai*, 375 F.3d at 1247, the Sentencing Commission "unambiguously cast a broader net by applying the enhancement to any offense that 'involved' or was 'intended to promote' a terrorism crime."  In its ordinary usage the Seventh Circuit said in *Arnaout*, 431 F.3d at 1002, "promote" means "to help or encourage" (citing Random House Webster's College Dictionary 1042 (2d ed. 1997)).  Thus, "the word 'promote,' as used in § 3A1.4, signifies that where a defendant's offense or relevant conduct helps or encourages a federal crime of terrorism as defined in 18 U.S.C. § 2332b(g)(5)(B), then § 3A1.4

is triggered." *Id.  See also Mandhai*, 375 at 1248 (applying § 3A1.4 "if a goal or purpose was to bring into being a crime listed in § 2332b(g)(5)(B)).

Also, the term "government" in § 2332b(g)(5)(A) is not limited to the United States government.  *United States v. De Amaris*, 406 F. Supp. 2d 748, 750-51 (S.D. Tex. 2005), contains an excellent discussion of this issue and holds that "government" is broad enough to include foreign governments.  *De Amaris* notes that, when Congress wants to limit the term "government" to the United States, it does so explicitly, as in 18 U.S.C. § 2332b(b)(1)(C), where "United States Government" applies to the separate criminal offense of terrorism transcending national boundaries.  *Id.*, 406 F. Supp. 2d at 750.  Similarly, § 2332b(g)(5)(A) was applied by the Fifth Circuit to destruction of a municipal government building in *Harris*, 434 F.3d at 774, where the intent was to retaliate against or to intimidate city police officers.

Because, as noted, § 371 conspiracies can incur the terrorism enhancement, it is important to apply the concept of foreseeability common in conspiracy law under *Pinkerton v. United States*, 328 U.S. 640 (1946), and its progeny.  That case holds that conspirators are criminally liable for substantive crimes committed by their co-conspirators in furtherance of the conspiracy, unless the substantive crime "did not fall within the scope of the unlawful project, or was merely a part of the ramifications of the plan which could not be reasonably foreseen as a necessary or natural consequence of the unlawful agreement."  *Id.*  at 647-78.  Under *Blumenthal v. United States*, 332 U.S. 539, 557 (1947), a defendant's knowledge of the scope and details of a conspiracy can be limited.  The prosecution does not have to show that a defendant knew the details of the plan, the identity, number, or function of the co-conspirators.  *Id.  Accord*, *United States v. Beecroft*, 608 F.2d 753, 757 (9th Cir. 1979) (each conspirator need not know what other

participants are doing and why); *United States v. Kearney*, 560 F.2d 1358, 1362 (9th Cir. 1977)

([i]t need not even be shown that [defendant] knew all the purposes of and all the participants in

the conspiracy").

In sum, the terrorism enhancement applies if:

(1)  the offense is a felony (either a conspiracy or a substantive offense)

(2)  that either (a) involved or (b) was intended to promote (i.e., help or

encourage)

(3)  a federal crime of terrorism, which means an offense that is

(a)  calculated to influence or affect the conduct of government by

intimidation or coercion or to retaliate against government conduct, and

(b) is a violation of any of the numerous statutes itemized in 18 U.S.C.

§ 2332b(g)(5)(B).

c.    Application to Individual Offenses

The version of § 2332b(g)(5)(B) in effect contemporaneously with the November

1, 2000, version of the guidelines (expressly applicable under the plea agreement) includes four

substantive crimes applicable to the conduct in this case:  18 U.S.C. § 844(f), arson of

government property; § 844(i), arson of property used in or affecting interstate commerce; §

1361, injury or attempt to injure U.S. Government property; and § 1366, destruction of an energy

facility.  Each of the ten defendants pled guilty to a § 371 conspiracy count which specified

(emphasis added):

The general purposes of the conspiracy were to influence and affect the
conduct of government, commerce, private business and others in the
civilian population by means of force, violence, sabotage, mass destruction,
intimidation and coercion, and by similar means to retaliate against the

Page 59  -  **Government's Sentencing Memorandum**

conduct of government, commerce and private business.

Beginning with that overall (but nonetheless specific) purpose of all ten defendants' conduct, it is clear that the object encompassed numerous completed, substantive crimes that qualify as "federal crimes of terrorism."

(1)  Oakridge Ranger Station:  This massive arson destroyed U.S. Forest Service property in violation of 18 U.S.C. § 844(f) and, coincidentally, 18 U.S.C. § 1361.  It occurred after years of angry confrontation between protestors (many from Eugene) and the Forest Service over the hotly contested Warner Creek timber sale.  One of those dedicated protestors was Kevin Tubbs, an arsonist at Oakridge.  The fire was directly linked to the Warner Creek controversy and was calculated to retaliate against the Forest Service's conduct, as well as to influence or affect the Forest Service's conduct by intimidation or coercion.

(2)  Burns BLM Wild Horse Corrals:  This arson destroyed BLM property in violation of 18 U.S.C. §§ 844(f) and 1361.  According to the communique, written by Tubbs, the crime was aimed at halting BLM's "illegal and immoral business of rounding up wild horses from public lands and funneling them to slaughter."  The communique specifically referred to a January 1997 Associated Press article linking BLM's wild horse program to private slaughterhouses.  Plainly, the Burns BLM arson and property destruction was calculated to retaliate against the government program and to intimidate and coerce the government into stopping it.  Indeed, the communique stated, "The practice of rounding up and auctioning wild horses must be stopped."

(3) <u>Rock Springs BLM Wild Horse Corrals</u>:  Much the same applies to the attempted arson and destruction of BLM's Rock Springs facility, which involved and promoted violations of 18 U.S.C. §§ 844(f) and 1361 (both of which contain an attempt provision).  The communique referenced BLM's effort "to continue their genocide against American's Wild Horse Nation" by "slaughtering horses for foreign dinner plates."  It warned BLM to cease its activity or face a further campaign which "will only intensify."  Again, the crimes involved and promoted specific offenses listed in 18 U.S.C. § 2332b(g)(5)(B) and were calculated to retaliate against government conduct and to intimidate or coerce the government into changing its conduct.

(4) <u>Litchfield BLM Wild Horse Corrals</u>:  Again, the conspiracy succeeded in committing substantive violations of 18 U.S.C. §§ 844(f) and 1361.  The conduct of defendants demonstrably involved and promoted those substantive offenses.  According to the communique (written by Darren Thurston), BLM "rounded up thousands of wild horses and burros to clear public land for grazing cattle," and many of the animals were "sent to slaughter."  The communique threatened continued targeting of "industries and organizations that seek to profit by destroying the Earth."  The message again was clear:  the arson and destruction of property was in retaliation for government action and was meant to coerce or intimidate a change in government policy.

(5) <u>BPA Transmission Tower</u>:  This conduct succeeded in violating 18 U.S.C. §§ 1366 (destruction of an energy facility) and 1361 (injury of government property), both enumerated crimes under § 2332b(g)(5)(B).  The offense targeted a government agency and was designed to cripple the government's distribution of electric power generated at government

facilities.  The participants calculated it to influence and affect government conduct by physical

intimidation and coercion and to retaliate for existing government conduct.

      (6) <u>Cavel West Horse Rendering Plant</u>:  This conduct specifically violated an

enumerated statute under § 2332b(g)(5)(B), namely, 18 U.S.C. § 844(i) (arson of property in

interstate commerce).  Although the government was not a direct victim, it was nonetheless a

federal crime of terrorism because of the offenders' motivation.  As noted above, the group on

three occasions targeted government wild horse facilities specifically because they rounded up

horses and sent them away for private slaughter.  In their eyes, Cavel West was the most

infamous of these slaughterhouses buying government horses.  About six months before the

Cavel West arson, Associated Press reporter Martha Mendosa published an article describing the

BLM wild horse program and naming Cavel West as a purchaser of government horses.  Kevin

Tubbs has acknowledged he chose Cavel West as a target after carefully researching it.  That

was not difficult, since the business' notoriety was widespread, especially in the animal rights

community.  Indeed, the communique refers to the "countless protests and letter writing

campaigns" that had been directed against it, especially after the AP article.  The Cavel West

arson was calculated to retaliate against the BLM horse program and to intimidate and coerce

BLM into ceasing the program, as well as to put Cavel West, BLM's wild horse purchaser, out

of business.

      (7) <u>Vail Ski Resort</u>:  The buildings burned in the massive fires at Vail were

privately owned, and the substantive offense is arson affecting interstate commerce under 18

U.S.C. § 844(i), an enumerated statute in § 2332b(g)(5)(B).  The land where the buildings, ski

slopes and lifts sit, however, is within the White River National Forest of the U.S. Department of

Agriculture.  The Vail Ski Resort was targeted because it expanded into this federal forest.  The arson occurred after years of heated controversy among developers, the government and vocal opponents.  Following considerable legal wrangling and many hearings, government action permitted the expansion to proceed, much to the dismay of environmental activists.  Unquestionably, this arson was in retaliation for the conduct of both government and private business.  The communique (authored by Chelsea Gerlach) also addressed the future, noting that Vail "now wants to expand even further" with "12 miles of roads and 885 acres of clearcuts."  That, of course, referred to development of National Forest land.  The communique called the huge fire "just a warning":   ELF "will be back if this greedy corporation continues to trespass into wild and unroaded areas," namely, the White River National Forest.  There is no question this was calculated not just to retaliate but also to intimidate and coerce future decisions by both the government and the Vail corporation.

(8)  <u>West University Public Safety Substation</u>:  This arson, albeit unsuccessful, was a violation of 18 U.S.C. § 844(i).  It served both as a training exercise for new timing devices prior to the Romania arson and as a retaliatory strike against the Eugene Police Department (EPD), a governmental agency.  The attack on the substation occurred after a long period of conflict between local anarchists and other activists involving numerous street confrontations and arrests, including what was called the "Seven Week Revolt."  Defendants in this case used the arson to send a message to EPD and the Eugene activist community that such government conduct would not stand without serious retaliation.  This arson therefore was a federal crime of terrorism under § 2332b(g)(5).

Page 63  -  **Government's Sentencing Memorandum**

> (9)   U.S. Forest Industries
> (10)  Boise Cascade Corporation
> (11)  Superior Lumber Company

These three completed arsons violated 18 U.S.C. § 844(i), thereby qualifying under the enumerated statutes in § 2332b(g)(5)(B).  Each of the targets was well researched by defendants.  At the time of the arsons, each timber company was a well known purchaser and harvester of trees from both government and private land.  As in the case of Warner Creek, government timber contracts throughout Oregon were a matter of intense dispute during this time.  Environmental activists strongly resisted and protested them.  ELF, acting through defendants, carefully selected three businesses to retaliate against their private and government-related conduct.

The U.S. Forest Industries communique noted the arson "was done in retribution for all the wild forests and animals lost to feed the wallets of greedy fucks like Jerry Bramwell, U.S.F.I president."  The "wild forests" necessarily refer to federal land in Oregon subject to timber sales.  The fire was "payback," the communique said, but also "a warning" to "all others responsible" (e.g., the U.S. Government).  This warning was calculated to influence or affect the future conduct of government and private business by intimidation or coercion under the standard of § 2332b(g)(5)(A).

The Boise Cascade communique accused that corporation of "ravaging the forests of the pacific northwest," which necessarily included Boise Cascade's timber purchases from the U.S. Government.  The communique brought in a foreign government as well, by noting that "Boise Cascade now looks towards the virgin forests of Chile."  See *United States v. De Amaris*, 406 F. Supp. at 750-51 ("government" under § 2332b(g)(5)(A) includes foreign governments).

Page 64  -  **Government's Sentencing Memorandum**

It went on to warn "all greedy multinational corporations who don't respect their ecosystems,"
i.e., who harvest virgin forests from government land and other sources.

Similarly, the Superior Lumber Company communique, authored by Daniel
McGowan and Suzanne Savoie, characterized that business as "a typical earth raper contributing
to the ecological destruction of the Northwest." That is a reference to what timber companies do
– harvest trees – which at that time included trees on government land purchased through
government contracts. Again, the arson was retaliation for conduct by both private business and
government, thereby meeting the motivational test of § 2332b(g)(5)(A). And, once more, ELF
warned, "This year, we hope to see an escalation in tactics against capitalism and industry."
These "earth rapers" would be destroyed like Superior Lumber, should they follow suit and cut
Northwest timber, be it private or government.

(12)  <u>Romania Chevrolet Truck Center</u>:  This arson involves 35 counts in
violation of 18 U.S.C. § 844(i).  They were committed in direct retaliation for local government
activity in the prosecution and trial of Jeffrey "Free" Luers and Craig "Critter" Marshall for
earlier arsons at the same location.  The communique makes this clear:

> Romania Chevrolet is the same location that was targeted last June
> for which two earth warriors, Free and Critter, are being persecuted.
> The techno-industrial state thinks it can stop the growing resistance
> by jailing some of us, but they cannot jail the spirit of those who
> know another world is possible.  The fire that burns within Free and
> Critter burns within all of us and cannot be extinguished by locking
> them up.

The communique goes on to criticize the "prison system" and urges people to "strike out"
"before we are all either choking on smog or held captive by the state."  While also an attack on
the automotive industry, the Romania arsons were primarily directed against the local

Page 65   -  **Government's Sentencing Memorandum**

government, both in retaliation for the Luers/Marshall trial and imprisonment, and in influencing and affecting government's conduct in that regard by coercion and intimidation.

    (13)  <u>Jefferson Poplar Farm</u>
    (14)  <u>University of Washington (UW)</u>

    As described in the factual summary above, these two arsons under 18 U.S.C. § 844(i) were closely interrelated.  They were jointly planned and carefully coordinated.  As the chosen date drew closer, arsonists met in Olympia and made final preparations, including construction of the timing devices.  They had a common goal:  to strike out against the perceived "evils" of genetic engineering and research (GE), both by a private business and by a state university.

    Each arson had its own communique, but there was specific cross-reference between them.  The UW communique (labeled "Part 1") stated the attack on UW Professor Toby Bradshaw's office occurred "at the same time another group set fire to a related target in Clatskanie, Oregon, 150 miles away."  Clearly done in retaliation for a government institution's GE work, the UW arson was also related to a GE arson at another state institution, Michigan State University, the communique stated.  It threatened "universities" performing GE work by warning, "they run the risk of suffering severe losses," and "we are determined to stop genetic engineering."  In addition to retaliating, it was unquestionably calculated to change the future conduct of UW and other government institutions by intimidation and coercion.

    The Jefferson Poplar Farm communique (labeled "Part 2"), originally drafted by Gerlach and McGowan, tied the arson to the need to stop "monocultured tree farms" and "greedy,

earth raping corporations." The communique made an additional, express warning to state governments in Oregon and Washington:

> Pending legislation in Oregon and Washington further criminalizing direct action in defense of the wild will not stop us and only highlights the fragility of the ecocidal empire.

By linking the private poplar farms to the conduct of state governments under the umbrella "ecocidal empire," the communique demonstrated the overall motivation of the crime, namely, retaliating against government and private conduct and, by coercion and intimidation, attempting to influence and affect their conduct in the future, the very standard for a federal crime of terrorism under § 2332b(g)(5)(A).[10]

      d.    <u>Application to Individual Defendants</u>

      The court starts with the admission by all ten defendants, encompassed within their guilty pleas, that each of them was part of an overarching conspiracy with the purpose, among other things, "to influence and affect the conduct of government" and others by means of violent acts, and "to retaliate against the conduct of government" and others. That was the conspiracy's *raison d'etre*, and it is attributable to each defendant both by virtue of the § 371 count and their individual conduct under the substantive counts. That is, their conduct both involved and promoted federal crimes of terrorism.

---

    [10] The government does not argue that the arson at Childers Meat Company qualifies as a federal crime of terrorism, but that arson does fit within the alternative argument, if necessary, for an upward departure for terrorism, as discussed below.

(1)    <u>Stanislas Gregory Meyerhoff</u>

Meyerhoff was a participant in the § 371 conspiracy and in the individual arsons and attempted arsons at BLM Litchfield, Jefferson Poplar Farm, Romania Chevrolet, Superior Lumber, EPD Substation, Boise Cascade, Childers Meat, Vail, BLM Rock Springs, and the BPA tower toppling.  He had a leadership role in the conspiracy and in several of the substantive crimes.  All of his listed offenses of conviction (with the exception of Childers Meat) qualify as federal crimes of terrorism, and Meyerhoff was actively involved in and promoted them, thereby meeting the standards of U.S.S.G. § 3A1.3.

(2)    <u>Kevin Tubbs</u>

Tubbs was an active conspirator from 1996 onward and fully subscribed to the conspiracy's terroristic goals.  He shares heavy responsibility for crimes at the Oakridge Ranger Station, Cavel West, BLM Burns, BLM Rock Springs, Vail, U.S. Forest Industries (the attempt), Childers Meat, EPD Substation, the BPA tower, Romania Chevrolet, Superior Lumber, Jefferson Poplar Farm, and BLM Litchfield.  There is no question he had the requisite motivation and completed numerous crimes required for the terrorism enhancement.

(3)    <u>Chelsea Dawn Gerlach</u>

Gerlach became motivated at an early age to sabotage and destroy the property of both the government and private businesses (see further discussion of her life below).  She gave effect to this motivation as a busy member of the conspiracy and took part in many of the crimes that meet the requirements of federal crimes of terrorism:  Vail, BLM Rock Springs, Boise Cascade, BPA tower, EPD Substation, Superior Lumber, Romania Chevrolet, Jefferson Poplar Farm, and BLM Litchfield.

Page 68  -  **Government's Sentencing Memorandum**

(4)    <u>Daniel Gerard McGowan</u>

As described below in the section covering his extensive activities, McGowan was steeped in hostility toward government and private business from at least 1997 right up to the time of his arrest in 2005. Time and again he used violence to retaliate for perceived grievances and to intimidate or coerce a change in government and private activities. "Rabid" was more than just a nickname for him. He meets the § 3A1.1 requirements in the conspiracy count and in the substantive counts of arson and attempted arson at Superior Lumber and Jefferson Poplar Farm.

(5)    <u>Nathan Fraser Block</u>
(6)    <u>Joyanna L. Zacher</u>

Even before their days in the Family, Block and Zacher were dedicated anarchists who, by definition, were anti-government. They carried that animus within the conspiracy and in the anti-government, anti-business arsons at Romania Chevrolet and Jefferson Poplar Farm, thereby qualifying for the terrorism enhancement in all their counts of conviction.

(7)    <u>Suzanne Savoie</u>

Closely associated with McGowan, Savoie shared his deep hostility against government and business. Both in the overall conspiracy and in her active participation in the substantive crimes at Superior Lumber and Jefferson Poplar Farm, Savoie furthered the prerequisites for the terrorism enhancement.

(8)    <u>Kendall Tankersley</u>

As a vocal activist, Tankersley frequently and publicly spoke out against the government, particularly on television.  She researched U.S. Forest Industries and Boise Cascade, discovering ideological support for targeting them, including their timber sale contracts with the government.  In both the conspiracy count and the substantive counts relating to U.S. Forest Industries, Tankersley should receive the terrorism enhancement.

(9)    <u>Jonathan Paul</u>

A longtime, highly dedicated animal rights proponent, Paul demonstrated his anti-government animus long before the instant crimes by victimizing state universities in Oregon, California and Arizona (see discussion below).  If he did not like what they did, he targeted them for retaliation, intimidation, and coercion.  This ideology and motivation transferred easily to the present conspiracy and the substantive arson at Cavel West.  As noted, that arson was closely tied to the government's practice of selling wild horses to the company for slaughter, which spurred the participants' motivation.  It qualifies all of the Cavel West arsonists, including Paul, for the terrorism enhancement.

(10)    <u>Darren Todd Thurston</u>

Thurston had proved his anti-government, anti-business credentials for at least 11 years prior to the 2001 arson at BLM Litchfield.  Even before entering the conspiracy for that crime, Thurston associated with Family members, shared their ideological beliefs, espoused them over the Internet, and disseminated their highly charged literature.  One of his Canadian targets was a government university.  He aided in publicizing communiques for the U.S. Forest

Industries and Jefferson Poplar Farm arsons.  His arson in this case burned a government facility.
The anti-government motive is clear from the communique which he wrote and distributed.

      The government anticipates Thurston may argue against the terrorism
enhancement on the ground he pled guilty only to a § 371 conspiracy and a single count of §
844(f)(1), rather than §844(f)(2) or (3).  As noted above, § 371 conspiracies qualify for terrorism
treatment if they promote a federal crime of terrorism, which definitely occurred here.  Also,
Thurston agreed to the 2000 version of the guidelines, in which § 3A1.1 references the then-
contemporaneous version of § 2332b(g), which listed § 844(i), with no limitation of any of its
particular subsections.

      e.     <u>Upward Departure as an Alternative</u>

      The facts and law present a strong argument for application of the § 3A1.4
enhancement to each of the ten defendants.  In the event this court disagrees as to any particular
defendant, the government submits the same result should be reached through an upward
departure, which the court has discretion to apply.

      Application Note 4 of the current § 3A1.4 states:

    4.  <u>Upward Departure Provision</u>.– By the terms of the directive to
the Commission in section 730 of the Antiterrorism and Effective
Death Penalty Act of 1996, the adjustment provided by this guideline
applies only to federal crimes of terrorism. However, there may be cases
in which (A) the offense was calculated to influence or affect the conduct
of government by intimidation or coercion, or to retaliate against
government conduct but the offense involved, or was intended to promote,
an offense other than one of the offenses specifically enumerated in
18 U.S.C. § 2332b(g)(5)(B); or (B) the offense involved, or was intended
to promote, one of the offenses specifically enumerated in 18 U.S.C. §
2332b(g)(5)(B), but the terrorist motive was to intimidate or coerce a
civilian population, rather than to influence or affect the conduct of
government by intimidation or coercion, or to retaliate against government
conduct.  In such cases an upward departure would be warranted, except

that the sentence resulting from such a departure may not exceed the top
of the guideline range that would have resulted if the adjustment under this
guideline had been applied.

Although not contained in the 2000 guideline manual, its insertion as commentary

in a later manual serves to clarify and add understanding to the words of a guideline section that

did not change, much like subsequent case law clarifying the intent of a statute.  The retroactive

application of amendments to the guidelines depends on whether the amendment (1) is merely a

clarification, or (2) implicates the ex post facto prohibition.  As the court stated in *United States*

*v. Sanders*, 67 F.3d 855, 856 (9th Cir. 1995), "if a court applies an earlier edition of the

Guideline Manual, the court shall consider subsequent amendments, to the extent that such

amendments are clarifying rather than substantive changes."  In *Sanders* an amendment added a

provision to the commentary of the guidelines after defendant committed the offense.  Despite

the fact the amendment contradicted, and thus altered, Ninth Circuit case law on point, the court

still characterized the amendment as a clarification.  *Id.* at 857.  In doing so, the court relied

largely on the fact the change benefitted defendant and therefore did not raise ex post facto

concerns.  *Id.*

The ex post facto clause bars retroactive application of amendments if the

subsequently employed guideline leads to a harsher sentence.  *Johnson v. Gomez*, 92 F.3d 964,

968 (9th Cir. 1996).  *Gomez* held a defendant must demonstrate that a harsher sentence is a

certainty, rather than a possibility, before the ex post facto clause will prohibit the increase.  *Id.*

Defendants in this case cannot show that a harsher sentence is a certainty because of the

subsequent application note of § 3A1.4, since departures are by nature discretionary.  Even if

they could, however, the court could still consider the language of the later application note

Page 72  -  **Government's Sentencing Memorandum**

because the catch-all provision of the guidelines is certainly broad enough to allow such

consideration. Under 18 U.S.C. § 3553(b), the sentencing court can deviate from the guidelines

to take into account any aggravating or mitigating circumstance that the guidelines did not

adequately consider. *United States v. Wells*, 163 F.3d 889, 899 (4th Cir. 1998). In addition, the

policy statement of the guidelines provides for departure in such circumstances. See U.S.S.G. §

5K2.0 ("Circumstances that may warrant departure from the guidelines pursuant to this provision

cannot, by their very nature, be comprehensively listed and analyzed in advance"). *Id.*

      All ten defendants engaged in terroristic conduct <u>both</u> under the terms of § 3A1.4

<u>and</u> under the departure formulation, be it under Application Note 4 or the more general

departure authority that pre-existed Application Note 4. By either theory, each defendant

deserves the increased guideline range recommended by the government.

### 3.    Departure for Substantial Assistance (U.S.S.G. § 5K1.1)

      This section provides, in pertinent part, as follows:

      Upon motion of the government stating that the defendant has provided
substantial assistance in the investigation or prosecution of another person who
has committed an offense, the court may depart from the guidelines.

  (a)    The appropriate reduction shall be determined by the court for the reasons
stated that may include, but are not limited to, consideration of the
following:

    (1)    the court's evaluation of the significance and usefulness of the
defendant's assistance, taking into consideration the government's
evaluation of the assistance rendered;

    (2)    the truthfulness, completeness, and reliability of any information or
testimony provided by the defendant;

    (3)    the nature and extent of the defendant's assistance;

    (4)    any injury suffered, or any danger or risk of injury to the defendant

or his family resulting from his assistance;

     (5)     the timeliness of the defendant's assistance.

**4.    Other Factors**

In addition to the above relevant factors under § 5K1.1 of the guidelines, the following factors were considered in the substantial assistance analysis:  background, role in the offense(s), relative culpability, and aggravating and mitigating factors for each defendant. Consideration of all these factors enabled the government to establish a fair and appropriate departure recommendation for each defendant.

### IV.  INDIVIDUAL DEFENDANTS

The defendants (and the aforementioned factors applicable to each) are listed in the order of their relative culpability, as follows:

**1.    <u>William Christopher Rodgers (deceased)</u>**



Born April 9, 1965**,**                       William Christopher Rodgers, also known as "Avalon" and "Mr.                     Green," was considered one of the principal leaders of the ALF/ELF movement and was a member of the cell known as the "Family."  He participated in at least six arsons over a four-year  period, causing over $30

Page 74  -  **Government's Sentencing Memorandum**

million in damage.  He grew and sold marijuana to help fund his and others' criminal acts.  The six arsons in which it is known he personally participated include the BLM Horse Corrals at Burns, Oregon, on November 30, 1997; the Animal, Plant Health Inspection Service office at Olympia, Washington, on June 21, 1998; the BLM Horse Corrals at Rock Springs, Wyoming, on October 11, 1998; the Vail Ski Resort at Vail, Colorado, on October 19, 1998; the Romania Truck Center at Eugene, Oregon, on March 30, 2001; and the University of Washington Horticulture Center at Seattle, Washington, on May 21, 2001.  Rodgers was the principal proponent of and the leader at the Vail Ski Resort and the University of Washington Horticulture Center arsons.

Many of the cell members viewed Rodgers as the principal leader, and he was responsible for recruiting at least six of them.  He was over ten years older than most of the other cell members and used his charisma and commitment to the ALF/ELF cause to convince others to join the cell.  Rodgers was one of the people responsible for forming the Book Club which consisted of 16 people who attended a series of instructional meetings.  As stated earlier, these meetings were held at five different sites around the West Coast, and participants were instructed in building improvised incendiary devices, computer security, performing reconnaissance, lock-picking, the use of codes for communication, and other subjects.  Nine members of the Book Club became members of the cell known as the "Family," and three other members are suspects in other acts of arson.

Rodgers authored several instructional manuals on how to perform malicious destruction and arson.  One of the first manuals was called *The Black Cat Sabotage Handbook* and another was *Setting Fires with Electrical Timers: An Earth Liberation Front Guide,* which was placed on