Craig E. Weinerman, OSB No. 96013
Assistant Federal Public Defender
Patrick Ehlers, OSB No. 04118
Assistant Federal Public Defender
151 W. 7th Avenue, Suite 510
Eugene, OR 97401
Craig_Weinerman@fd.org
Patrick_Ehlers@fd.org
(541) 465-6937 (telephone)
(541) 465-6975 (facsimile)

Attorneys for Defendant

### IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>**Plaintiff,**<br><br>**vs.**<br><br>**CHELSEA DAWN GERLACH,**<br><br>**Defendant.** | **CR 06-60079-AA**<br>**06-60122-AA**<br><br>**MEMORANDUM OF LAW OPPOSING IMPOSITION OF TERRORISM ENHANCEMENT** |

## I.      INTRODUCTION

Which name does not belong:

1.      Timothy McVeigh, convicted of crimes relating to the bombing of the Murrah

Building in Oklahoma City, including use of a weapon of mass destruction,

in violation of 18 U.S.C. §2332(a), destruction by explosives, in violation of

18 U.S.C. §844(f), and first degree murder, in violation of 18 U.S.C. §§1111

and 1114.  The bombing killed 168 people and injured hundreds more;

2.     Eric Rudolph, convicted of pipe bomb attacks at two family planning clinics

in Atlanta, Georgia, and Birmingham, Alabama, a nightclub in Atlanta,

Georgia, and the Centennial Olympic Park bombing, resulting in the death of

two people and the wounding of more than 110, in violation of 18 U.S.C.

§§844(i) and 924(c);

3.     Ramzi Yousef, convicted of the 1993 World Trade Center bombing, resulting

in the death of 6 people and injury to more than 1,000 others, in violation of

18 U.S.C. §§ 33, 34, 371, 844(i), 844(d), 844(f), 924(c), 111 and 1952;

4.     John Walker Lindh ("the American Taliban"), convicted of supplying services

to a terrorist organization – the Taliban – and carrying weapons while fighting

for the Taliban in Afghanistan against the U.S.-backed Northern Alliance, in

violation of 50 U.S.C. §1705(b), 31 CFR §§545.204 and 545.206(a), and 18

U.S.C. §844(h)(2); and

5.     Chelsea Dawn Gerlach, convicted of conspiracy, arson, and damage to a

transmission tower, in violation of 18 U.S.C. §§371, 844(i) and 1366(a),

resulting in property damage but no death or injury to anyone.

Chelsea Gerlach does not belong on this list.  She is not a "terrorist" and the terrorism

enhancement does not apply to her sentence.

**Page 2 -       Memorandum of Law Opposing Imposition of Terrorism Enhancement**

## II.    THE TERRORISM ENHANCEMENT DOES NOT APPLY TO ACTS THAT INTEND DAMAGE TO PROPERTY BUT DO NOT INTEND DEATH OR BODILY INJURY TO PEOPLE.

Congress and the Sentencing Commission did not intend that the terrorism enhancement apply to acts designed to damage property but were not accompanied by an intent to kill or maim.  Only crimes that create a substantial risk of death or serious bodily injury constitute crimes of domestic terrorism under 18 U.S.C. §§2332b(a) and (g)(5).

A common sense interpretation of the terms "terrorism" in U.S.S.G. §3A1.4 and "Federal crime of terrorism" in 18 U.S.C. §2332b(g)(5), requires that it exclude instances where a defendant did not intend to harm another person and only intended to damage property.  *See Lopez v. Gonzales*, 127 S.Ct. 625, 629-30 (2006) (Court looks to the "commonsense" meaning of the term "trafficking" and concludes it encompasses commercial dealing and not simple possession).  In this case, the arson and transmission tower offenses did not cause death, injury, or create a substantial risk of death or injury to any person.   Ms. Gerlach's intent was to damage property only.

A.    The Term "Terrorism" Is Vague.

Federal law contains nineteen definitions or descriptions of terrorism.  Nicholas J. Perry**,** *The Numerous Federal Legal Definitions of Terrorism: The Problem of Too Many Grails*, 30 J. Legis. 249, 255 (2004).  Courts have said that the United States "characterizes rather than enumerates acts [of terrorism] for the purposes of . . . defining criminal terrorist offenses under federal law" because of the uncertainty with respect to what constitutes terrorism.  *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 17 (D.D.C. 1998).  The law suffers from a lack of clarity about terrorism, and what

actually constitutes a terrorist act, because of these different definitions.  Most people would agree that the Oklahoma City bombing and September 11 attacks were acts of terrorism.  After that, however, it is difficult to know where the line is drawn, especially when confronted with so many conflicting definitions in United States and international law.  Ms. Gerlach's crimes were sufficiently different than Oklahoma City or September 11 to actually be considered terrorism and punished as harshly.

> B.     Ms. Gerlach's Crimes Are Beyond The Scope Of Legislative Intent In Defining The Term "Federal Crime Of Terrorism" In 18 U.S.C. §2332b(g)(5).

Even if the term "Federal crime of terrorism" is not vague and uncertain, the legislative history of U.S.S.G. §3A1.4 and 18 U.S.C. §2332b(g)(5) lend support to the argument that Ms. Gerlach's crimes do not constitute the "Federal crime of terrorism."

U.S.S.G. §3A1.4 was first promulgated in 1995 when Congress directed the Sentencing Commission to create an appropriate enhancement for any felony, whether committed within or outside the United States, that involves or is intended to promote international terrorism.  Deborah F. Buckman, Annotation, *Construction and Application of Federal Domestic Terrorism Sentencing Enhancement, U.S.S.G. § 3A1.4,* 186 A.L.R Fed. 147 (2003).  In 1996, in response to the Oklahoma City Bombing, the guideline was changed in order to make it equally applicable to domestic terrorism.  Congress, through the AEDPA, directed the Sentencing Commission to change the term "international terrorism" to the far broader term "Federal crime of terrorism."  Buckman, *supra*.

**Page 4 -       Memorandum of Law Opposing Imposition of Terrorism Enhancement**

Congress, however, recognized that "terrorism" is a phrase that carries far-reaching connotations and thus should not be used indiscriminately. Having evolved from no guideline at all on crimes involving terrorism, the legislators believed it was important not to sweep too broadly. Congress therefore sought to carefully develop an accurate and narrow definition "in order to keep a sentencing judge from assigning a terrorist label to crimes that are truly not terrorist . . . ." H. Rep. No. 104-383, at 114 (1995). The goal, according to the House Judiciary Committee's Chairman, was to "delete the overly broad definition of terrorism." *Id.* To apply the enhancement to Ms. Gerlach would go against the very ideas behind it: to stay away from an overly broad definition and allow judges to assign a terrorist label to crimes that are not truly terrorist in nature.

In creating the new definition of "Federal crime of terrorism," Congress had a particular idea about what kind of activities it would include. The House Report explained the background and need for the amendment to "Federal crime of terrorism":

> Terrorism potentially affects all Americans, both at home and abroad. It threatens our public safety, restricts the freedom to travel, and reduces our sense of personal security. Nothing is more potentially threatening or destructive. Innocents are annihilated. Families are destroyed. There are numerous tragic examples of terrorism's victims, including:
>
> > the bombing of a German discotheque killing American military personnel;
> >
> > the bombing of the U.S. Embassy in Beirut;
> >
> > the bombing of Pan Am Flight 103;

**Page 5 -        Memorandum of Law Opposing Imposition of Terrorism Enhancement**

the hostage takings of Americans in the Middle
East;

the torture and murder of U.S. Marine Colonel
William ``Rich'' Higgins;

the murder of American tourist Leon Klinghoffer;

the murders of American Foreign Service
personnel in Karachi, Pakistan;

the murders of CIA employees at the gates of the
CIA in McLean, Virginia; and

the 10 bombings in the Washington, D.C. area
since 1982 by estranged segments of our society,
each advancing a different radical political cause.

H. Rep. No. 104-383 (1995). Congress intended to protect the American people from

serious terrorist attacks like those listed by greatly increasing the punishments for those

crimes. There is a stark difference between the examples listed above and the arson and

transmission tower offenses Ms. Gerlach committed. The examples listed in the legislative

history make it clear that Ms. Gerlach's offenses are not what Congress had in mind when

it broadened the definition of terrorism.

In a Sixth Circuit case that affirmed the application of U.S.S.G. 3A1.4 to enhance the

defendant's sentence, Senior District Judge Avern Cohn wrote a lengthy dissent. *United

States v. Graham*, 275 F.3d 490, 524-44 (6th Cir. 2001) (dissenting opinion). The defendant

in that case was a member of a local militia organization which was planning to attack

government targets on an unspecified future date. The defendant also grew and sold

**Page 6 -        Memorandum of Law Opposing Imposition of Terrorism Enhancement**

marijuana, part of the proceeds of which he used to help pay for weapons acquisitions related to his militia activity. *Id.* at 496-97.  The application of the enhancement added over 250 months to his sentence.  *Id.*  at 524.  Judge Cohn strongly disagreed with the decision, pointing to the legislative history discussed above.  He explained that the history "shows a particular concern by the Congress that the 'Federal crime of terrorism' enhancement is to be applied only in a narrow set of circumstances."  *Id.* at 529.  "Plainly, the legislative history of the statutes reflects a concern by Congress, much like the concern of the delegates to the Constitutional Convention of 1787 over the definition of 'treason,' that 'terrorism' being a phrase which carries far-reaching connotations that is not to be used indiscriminately and must be carefully defined."  *Id.* at 537.

## III.    THE TERRORISM ENHANCEMENT DOES NOT APPLY TO CONDUCT THAT DID NOT TRANSCEND NATIONAL BOUNDARIES.

The plain meaning of the statutory language "require[s] that a 'Federal crime of terrorism, as defined in 18 U.S.C. §2332b(g), is one that involves conduct [that] transcend[s] national boundaries."  *United States v. Salim*, 287 F.Supp.2d 250, 339 (S.D.N.Y. 2003) (Batts, D.J.); *contra United States v. Harris*, 434 F.3d 767, 773 (5th Cir. 2005) (application of the terrorism enhancement is not predicated on conduct that transcends national boundaries); *see generally, United States v. Jordi*, 418 F.3d 1212, 1216-17 (11th Cir. 2005) (not deciding whether the terrorism enhancement requires a showing that the defendant's conduct "transcended national boundaries" because the government sought an upward

Page 7 -        **Memorandum of Law Opposing Imposition of Terrorism Enhancement**

departure under Application Note 4 to U.S.S.G. 3A1.4 and not an upward adjustment under §3A1.4(a)).

The definition of "conduct transcending national boundaries" states clearly that there must be both an external and internal component to the conduct. The plain meaning of the statute is unambiguous in this regard. This is why Congress used the term "in addition to" as opposed to "or" when stating that "'transcending national boundaries' means conduct occurring outside the United States *in addition to* the conduct occurring in the United States[.]" 18 U.S.C. § 2332b (g)(1). This language supports the idea that Congress had acts very different than Ms. Gerlach's in mind when creating the enhancement. Ms. Gerlach's conduct was purely domestic and did not transcend national boundaries. As such, her conduct falls outside the scope of the terrorism enhancement.

In *Salim*, the Court refused to apply the terrorism enhancement to a defendant who pleaded guilty to conspiring and attempting to murder a corrections officer because the act did not transcend national boundaries. The Court explained that it is

> apparent that, in adopting the final version of the AEDPA, Congress did not intend to bring within the sweep of its definition of a "Federal crime of terrorism" conduct that was purely domestic. This is apparent from the consistent focus throughout the successive version of the bill on crimes of terrorism that had an international component, from the rejection of a version that had applied to solely domestic conduct, and from the consistent placement of the term "Federal crime of terrorism" within a section entitled "Acts of terrorism transcending national boundaries."

**Page 8 -        Memorandum of Law Opposing Imposition of Terrorism Enhancement**

*Id.* at 349.  As in *Salim*, this Court should find that the domestic nature of the conduct at issue precludes application of the terrorism enhancement.

## IV.   THE GOVERNMENT HAS NOT MET ITS BURDEN OF PROVING BY CLEAR AND CONVINCING EVIDENCE THAT THE TERRORISM ENHANCEMENT SHOULD BE IMPOSED.

Because the imposition of the terrorism enhancement would have "an extremely disproportionate" impact on Ms. Gerlach's sentence, the government must prove by clear and convincing evidence that it is applicable.  *United States v. Staten*, 466 F.3d 708, 717 (9th Cir. 2006) ("[w]here an extremely disproportionate sentence results from the application of an enhancement, the government may have to satisfy a 'clear and convincing' standard.") (internal citations omitted).

The government has failed to prove by clear and convincing evidence that the arsons were calculated to influence or affect the conduct of government by intimidation or coercion or retaliate against government conduct.

The Vail arson was calculated to victimize a private entity, the Vail Ski Resort, and not the government.  The communique that was sent to the news media following the Vail arson explains that the arson targeted the owners of the ski resort who proposed to expand its operation and intrude upon lynx habitat.  The Vail arson was not calculated to influence, affect, or retaliate against the government or the U.S. Forest Service, neither of which is mentioned in the communique. The communique does not link the failure of any lawsuit filed against the expansion project or the failure of the Forest Service to properly analyze the

**Page 9 -       Memorandum of Law Opposing Imposition of Terrorism Enhancement**

environmental impact of the expansion on the lynx population with the decision to act against the Vail Ski Resort.

Similarly, the government has not proven by clear and convincing evidence that the purpose of the Boise Cascade arson was to influence, affect, or retaliate against the government. The communique that followed the arson explained that it was done to retaliate against a private company, Boise Cascade, for its logging practices in the northwest and Chile. It does not mention the government. This is not clear and convincing evidence of retaliation against the government.

Finally, the Jefferson Poplar Farms arson was designed to victimize a private entity and not the government. While the communique that followed the JPF arson referred to pending legislation in Oregon and Washington proposing to criminalize direct actions, that did not constitute an attempt to influence, affect, intimidate, coerce or retaliate against the government for hybrid tree farming practices conducted by a private entity.

## V.    CONCLUSION

This case became unnecessarily politicized when Attorney General Alberto Gonzales held a press conference on January 26, 2006, and used the term "domestic terrorism" to describe the offenses committed by the defendants in this case.

The government continues this unfortunate war of words and raises the stakes in this case by seeking the terrorism enhancement.

Neither Chelsea Gerlach nor any of the defendants in this case should be labeled a "terrorist" by the imposition of the terrorism enhancement as part of their respective sentences. These

defendants targeted property not people.  While it is true that an arson offense can cause unintended injuries and even death, the defendants in this case went out of their way to ensure that this would not happen.  As the old saying goes, "once is an accident, twice is a coincidence, and three times is a pattern."  It is no accident that the actions of the defendants in the 16 offenses charged in this case did not result in death or injury to anyone.  It is no coincidence that the actions of the defendants in the approximately 16 offenses charged in this case did not result in death or injury to anyone.  It is a pattern.

Neither Chelsea Gerlach nor any defendant in this case deserve to be described by the loaded term "terrorist."  They do not deserve the same label as Timothy McVeigh, Eric Rudolph, Ramzi Yousef, and John Walker Lindh.  The imposition of the terrorism enhancement should be reserved for those who intend to kill and maim and not those who target property for whatever misguided purpose.

RESPECTFULLY SUBMITTED May 4, 2007.

s/Craig E. Weinerman
Craig E. Weinerman
Attorney for Defendant


s/Patrick Ehlers
Patrick Ehlers
Attorney for Defendant

**Page 11 -        Memorandum of Law Opposing Imposition of Terrorism Enhancement**