1

1   UNITED STATES DISTRICT COURT

2   DISTRICT OF OREGON   FILED '07 JUL 09 14:23 USDC-ORE

3

4   THE HON. ANN L. AIKEN, JUDGE PRESIDING

5

6

7   UNITED STATES OF AMERICA,          )
                                        )
8                    Government,        )
                                        )
9        v.                             )  No. 06-60079
                                        )      06-60122
10  CHELSEA DAWN GERLACH,               )
                                        )
11                   Defendant.         )
    _____)

12

13

14   REPORTER'S EXCERPT OF PROCEEDINGS

15   EUGENE, OREGON

16

17   FRIDAY, MAY 25, 2007

18   PAGES 1 - 47

19

20

21                    Kristi L. Anderson
                      Official Federal Reporter
22                    United States Courthouse
                      405 East Eighth Avenue
23                    Eugene, Oregon 97401
                      (541) 431-4112
24                    Kristi_Anderson@ord.uscourts.gov

25



```
 1   APPEARANCES OF COUNSEL:

 2

 3   FOR THE GOVERNMENT:   UNITED STATES ATTORNEY
                          BY:   JOHN RAY, ESQ.
 4                        john.ray@usdoj.gov
                          and   KIRK ENGDALL, ESQ.
 5                        kirk.engdall@usdoj.gov
                          405 East Eighth Avenue
 6                        Eugene, Oregon 97401
                          (541)465-6771
 7

 8   FOR THE GOVERNMENT:   UNITED STATES ATTORNEY
                          BY:   STEPHEN PEIFER, ESQ.
 9                        1000 SW Third Avenue, Suite 600
                          Portland, Oregon 97204-2902
10                        (503)727-1044
                          steve.peifer@usdoj.gov
11

12   FOR THE DEFENDANT:   FEDERAL PUBLIC DEFENDER
                          BY:   CRAIG WEINERMAN, ESQ.
13                        151 West Seventh Avenue, Suite 510
                          Eugene, Oregon 97401
14                        (541)465-6937
                          craig_weinerman@fd.org
15

16   FOR THE DEFENDANT:   FEDERAL PUBLIC DEFENDER
                          BY:   PATRICK EHLERS, ESQ.
17                        101 SW Main Street, Suite 1700
                          Portland, Oregon 97204
18                        (503)326-2123
                          patrick_ehlers@fd.org
19

20

21   Also present:   Amanda Lee, Dan Feiner,

22

23

24

25
```

1           PROCEEDINGS

2           FRIDAY, MAY 25, 2007

3           THE COURT:  I'd be happy to hear anything you wish

4    to tell me before I impose the sentence.

5           THE DEFENDANT:  Thank you.

6           I would like to first apologize to everyone who

7    was hurt by my actions, to people who lost property, people

8    whose lives were disrupted, people who were made to feel

9    afraid.

10           We did create significant risks.  Fire is a

11   powerful and unpredictable element which we unleashed on a

12   large scale.  Earlier this week we saw a video of the Boise

13   Cascade fire, which was -- it was a large fire.  I had never

14   actually seen it before, and you couldn't see it on the

15   video that we saw, but I was there, and I know how close the

16   houses were to that fire, and the people in those houses

17   must have been terrified.  And we did those on Christmas

18   Eve.

19           I'm so sorry to those people and to all of the

20   others that were in similar situations and to the first

21   responders whose families had to wonder if they were coming

22   home.

23           Excuse me.

24           As the court has noted, we are intelligent, caring

25   people, and there is no excuse for being so cavalier about

1    the risks that we created and the impacts our actions had.

2            I would like to thank Mr. Rice and Mr. Sharek for

3    their testimony earlier this week.  I did not know that JPF

4    went out of business as a result of our actions, and I would

5    like to extend my apologies to the employees who lost their

6    jobs because of that, and to Ms. Ledbetter, excuse me, and

7    Mr. Sullivan, whose statements we heard yesterday.

8            I had no knowledge or involvement in the Oakridge

9    fire, but nonetheless, I feel some degree of guilt over my

10   association with the individuals who were.  And this was a

11   senseless act of destruction, and I am profoundly sorry to

12   you and to all of the forest service employees who were

13   affected.

14           And to the Childers family, who I understand had

15   conversations with Mr. Purdue in writing the PSR.  We have

16   heard a lot about me so far, but today is really about them,

17   and I want to thank all of the victims who participated in

18   these proceedings in any manner.  It is important that your

19   stories be heard.

20           I also want to thank Mr. Peifer and Mr. Engdall

21   and Mr. Ray for being willing to see me for who I am and not

22   just what I have done.  And Judge Aiken for taking the time

23   to understand this complex case.  And to everyone else who

24   has come and who has contributed in any way to resolving

25   this case with just consideration for everyone involved.

1          My attorneys talked about my background.  I'm not

2   going to get into too much detail about that.  But I do want

3   to add that I take full responsibility for my choices.  I

4   certainly do not blame my parents, who I love very much.

5   They taught me that violence is never an acceptable

6   response.  I'm glad that I was raised to be conscientious

7   and politically aware and with a strong connection to

8   nature.

9          Excuse me.

10          I spent a lot of time in the woods growing up, so

11   a forest was not just an abstract concept.  It was really

12   home in a very literal sense.  My parents built a house in

13   the woods when I was a baby, and my dad still lives there

14   today.

15          So when I learned the extent of environmental

16   destruction and saw clearcuts on national forests for

17   myself, I was heartbroken.  I wanted to make it right.  And

18   so I got involved in environmental activism, and my

19   experience with that over many years was disheartening.  For

20   every wild place that we saved temporarily, so many more

21   were lost forever.

22          I appreciate the court's reference to *An*

23   *Inconvenient Truth* earlier this week.  I haven't actually

24   seen it because I have been in jail since it came out, but

25   my mother saw it and was so inspired with it, she made up a

1   flier and passed it out at the local movie theater.  And

2   she's never done anything like that before, so I can only

3   imagine the impact that that film is having on a larger

4   scale.

5        I have been encouraged by increasing attention to

6   environmental issues in the past couple of years.  This is

7   part of a cultural shift that is necessary to build a

8   sustainable society.  This is a long process, and it cannot

9   be done by force.  I couldn't see that when I was an

10  impatient youth.  Unfortunately, the direction that I took

11  was influenced by the people that I was around, and that

12  path took me farther and farther from the compassion and

13  desire for peace and harmony that was at the foundation of

14  my activism.

15       I was motivated by a genuine love for the web of

16  life.  I have been in jail for 17 months now.  Eight months

17  of that was spent in solitary, not due to my behavior, but

18  due to the volume of paperwork in this case.  And I had to

19  find other ways to connect with that web of life.

20       I have been in touch with a group called the

21  Prison-Ashram Project, which the court may be familiar with,

22  and I am -- I highly recommend and have dedicated myself to

23  a regular spiritual practice.

24       I stopped engaging in these types of actions years

25  ago, but it was only until recently that I have been able to

1   articulate why.  It's very clear to me now that if I want to

2   live in a world of peace and harmony, I need to embody those

3   qualities in my own heart and in my own actions.  In this

4   age of global conflict and global warming, it is more

5   important than ever that we turn away from fear and

6   divisiveness and remember that we are all connected.  Love

7   is the only way.

8        This is a cultural shift, but it's also a personal

9   one.  It is a change that I have been making in my own life

10  over the past several years.  And I am so grateful that I

11  have been given this opportunity to reconcile with my past,

12  to try to heal myself and the others who were impacted by my

13  actions and to move forward.

14       My punishment is to go to prison, but my personal

15  atonement is to promote a better way to effect social change

16  based on spiritual principles.  This will be my purpose

17  wherever I am.  In jail here, I'm now in a dorm with 24

18  other women.  And I do yoga every day, and when I first

19  started doing that, some girls thought I was very strange,

20  but one by one, people started joining me, and I now teach a

21  class every day, and a lot of people have said that they

22  really appreciate that sense of calm in a very stressful,

23  intense environment.

24       As the court knows, there was recently a very

25  large federal drug bust, and there's woman involved in that

1 case in my dorm who doesn't speak hardly any English, and I
2 have been wanting to learn Spanish, so we have been doing a
3 language exchange. And she is just at the beginning of a
4 long process.

5 The court knows, not everyone here may know, that
6 most people in the jail don't stay there for very long.
7 There's a very high rate of turnover. But federal inmates
8 who are awaiting the resolution of their case can be there
9 for quite some time, and that's a rare circumstance. So I
10 can very much relate to the situation that she's in, and not
11 being able to speak the language, it's been very difficult
12 for her. So I have been endeavoring to teach her English
13 and to learn Spanish myself so that I can act to help her in
14 whatever way possible.

15 As the court alluded to, I have found the jail to
16 be a very fertile place to effect personal transformation
17 and have been able to be of service to others. I am excited
18 about the increased opportunities that will be available in
19 federal prison, and I very much appreciate Your Honor's
20 offer to write a letter to the BOP recommending that we be
21 able to tutor in the prison, which is very much what I would
22 like to do.

23 But I also hope that you will allow me to
24 reintegrate into my community as a positive, peaceful,
25 creative person, and to teach the lessons that I have

1    learned to people on the outside.

2           I have traveled a very long and difficult road,

3    you but thanks to all of you, I am now back on the right

4    path.

5           Thank you.

6           THE COURT:  I think your comments are incredibly

7    reflective and thoughtful and, I think, perhaps more

8    profound than I found Mr. Meyerhoff's.  And I can certainly

9    see and understand why your lawyers have so strongly

10   requested that the court see you as you are today and where

11   you will go in the future.  That you are truly sentencing

12   yourself to a better life.  That will be the sentence you

13   impose on yourself.  It will be our hope and expectation

14   that that is exactly what you will carry out the rest of

15   your life.

16          What I have been impressed by in this case is the

17   professionalism on both sides of the table.  It would be

18   very easy to make this about things beyond the dynamics of

19   the damage done to the individuals, the damage done to our

20   system of how decisions are made, and to simply take a group

21   of people and, one by one, lock them away for the rest of

22   their days.

23          Instead, I give a great deal of credit to

24   professionalism, balance, understanding of humanity and what

25   is expected in this system and how to truly weigh those and

1    make some decisions.

2             Accordingly, that's why I have taken as careful an

3    opportunity as I can to go through the guidelines because

4    that is the law.  If we truly respect that this is a country

5    ruled by laws, whether we agree with them or not, or whether

6    to do the mathematics one way is absurd because you have to

7    go another way in a different case, that is the law, and I

8    made those calculations and I have done my best to interpret

9    and follow the law.

10            But what we have often forgotten in the sentencing

11   context is it is truly about holding people accountable for

12   their behavior and then understanding that, by and large,

13   most people will return from prison into the communities.

14   And what we forget is when we bring people back into the

15   communities, do we bring people back in bitter, harder

16   criminals, more difficult to manage, and so angry that they

17   revictimize.

18            In all of this, it has not gone past me that there

19   are fears for you and for your conspirators in the prison

20   system.  But I like to expect that people will be better and

21   smarter when they evaluate and make decisions about where to

22   house you and where to house your coconspirators where you

23   can contribute and, with your change of heart, make it

24   easier to run a prison because you instill in other people

25   the belief that those of us who work in the system would

1   rather see you come out successful and ready to be part of

2   our community, as opposed to coming back and wanting to go

3   to war with the community.

4         So the letters we write and the letters that we

5   will follow up with are sincere and are done not only

6   individually to make certain that you are, in the

7   stewardship of this country, taken care of, because we are

8   responsible for you, but more importantly, it is our

9   obligation to the greater community that, when you do

10  reenter, you are coming back a person that the community can

11  embrace and can respect and live next to them and not be a

12  threat.

13        So I appreciate that the comments you made today

14  were thoughtful and insightful.  But I would really

15  appreciate if you wouldn't mind sharing where the change

16  came from, from the person that your lawyer met in Portland

17  when you were arrested and the person you are today.  What

18  changed?  What caused it?  What happened?

19        THE DEFENDANT:  Um, as has been said, Mr. Rodgers

20  committed suicide, and as a result of that, I -- and I

21  understand perhaps maybe other of the defendants who were in

22  custody at that time were placed on suicide watch by the

23  U.S. marshals, not because of our own behavior in any

24  respect, but as an abundance of caution and, at that time,

25  not knowing anything about any of us, but wanting to be

1  cautious.

2       And suicide watch is worse than the hole at Lane
3  County Jail. You get most of your clothes taken away and
4  just absolutely everything.

5       And I was in, at that time, 23-hour lockdown. Out
6  the window was just a brick wall, and I -- it was made clear
7  to me that I was facing a life sentence. And Mr. Ehlers
8  made clear to me immediately after my arrest that my only
9  hope of avoiding that life sentence was to cooperate with
10  the government. My reluctance to do that was not based on
11  any loyalty to my past actions, but out of a simple moral
12  sense that it was not -- that it was not a moral thing to do
13  to put someone else in jail so that I could get out of jail.
14  And that was why I was reluctant, and I took some time to
15  make that decision. And at that time, I was not -- I hadn't
16  reached that point. I didn't want to take that step.

17       So I was -- I was coming to terms with the fact
18  that I might never get out of prison again. I might never
19  see the free world again. And I was under extremely
20  difficult conditions of incarceration. It was over the
21  Christmas holiday. I did -- I did lose touch with my family
22  to some extent during the years that I was involved in this
23  action, but Christmas was a time that we were always
24  together. We always -- we always -- it was just a very
25  special time for us. And I hadn't even been able to see any

1    of my family at that time since my arrest.  So everything

2    was falling apart for me.

3           And my mother really saved me.  She sent me a book

4    called *When Things Fall Apart*, which was exactly what was

5    happening to me, written my Pema Chodron, a Buddhist nun.

6    And at suicide watch, you are not supposed to have anything,

7    but one of the deputies was kind enough to let me have a

8    book.  And that was the book that I had.  And I started

9    meditating, and that -- it changed me.  That was -- it

10   changed my whole perception on a lot of things.

11          THE COURT:  For those of you who have truly, I

12   would have to say, and I don't mean this in a judgmental

13   sense, I mean it in a factual sense, for those of you who

14   have let Ms. Gerlach down over the years, I want to read you

15   the following:

16          This was -- this is a part of a book by Marian

17   Wright Edelman.  And it's from a paragraph discussing what

18   it means to really be a family and a parent.

19          "Child-rearing and parental work are

20          inseparable.  I went everywhere with my parents,

21          and I was under the watchful eye of members of the

22          congregation and the community who were my

23          extended parents.  They kept me when my parents

24          went out of town, they reported on and chided me

25          when I strayed from the straight and narrow of the

1  community expectations, and they basked in and
2  supported my achievements when I did well.  Doing
3  well, they made clear, meant high academic
4  achievement, playing piano in the Sunday school,
5  or singing and participating in other church
6  activities, being helpful to someone, displaying
7  good manners, which meant nothing more than
8  consideration towards others, and reading.  My
9  sister, Olive, reminded me recently that the only
10  time our father would not give us a chore, 'Can't
11  you find something constructive to do?' was his
12  most common refrain, was when we were reading.  So
13  we all read a lot.  We learned early what our
14  parents and extended community of parents expected
15  and valued.  Children were taught not by
16  sermonizing, but by personal example, that nothing
17  was too lowly to do.

18       "I remember a debate my parents had when I
19  was eight or nine as to whether I was too young to
20  go with my older brother, Harry, to help clean the
21  bed and bedsores of a very sick, poor woman.  I
22  went and I learned just how much the smallest
23  helping hands and kindness can mean to a person in
24  need.

25       "The ugly external voices of my small-town,

1    segregated childhood were tempered by the internal

2    voice, of my parents and community expectations

3    and pride.  My father and I awaited anxiously for

4    the *Brown v. Board of Education* decision in 1954,

5    and we talked about it and what it would mean for

6    my future and for the future of millions of other

7    black children.  He died the week before *Brown* was

8    decided.  But I and other lucky children who cared

9    enough and had courageous and caring parents and

10   other adult role models were able, in later years,

11   to walk through the new and heavy doors that *Brown*

12   slowly and painfully opened, doors that some are

13   trying to close again today.

14        "The adults in our church and community made

15   children feel valued and important.  They took

16   time and paid attention to us.  They struggled to

17   find ways to keep us busy.  And while life was

18   often hard and resources scarce, we always knew

19   who we were and that the measure of our worth was

20   inside our heads and hearts and not outside in our

21   possessions or on our backs.

22        "We were told that the world had a lot of

23   problems.  That black people had an extra lot of

24   problems, but we were able and obligated to

25   struggle and change them.  That being poor was no

1    excuse for not achieving.  That extra intellectual

2    and material gifts brought with them the privilege

3    and responsibility of sharing with others less

4    fortunate.

5    "In sum, we learned that service is the rent

6    we paid for living.  It is the very purpose of

7    life and not something you do in your spare time."

8    Your parents, caring people, let you down.  A

9    16-year-old girl in a car going alone for two months into

10   the mountains, are you kidding me?  Their lack of

11   supervision -- you are a smart, smart person.  There are

12   juvenile facilities filled with kids like you who needed

13   guidance and care and direction.  Had you not had that

14   freedom and made those choices and gone that direction, I

15   agree with your lawyers, you might not be here today.

16   We are at a crossroads in this country of whether

17   children are really going to be valued and whether we are

18   going to make certain that we don't have children who make

19   the kinds of choices that you are able to make at 16,

20   because in reality, children and teenagers may act and talk

21   like adults, but they are not.  Their brains are still

22   forming.  Kids need their parents and other role models to

23   distinguish right from wrong.  Honorable people, not those

24   with sinister motives, need to step up and be caring adults

25   in the lives of children.

1       I know you love your parents. Every single child
2   who came before me, either physically or abused by their
3   parents, still loved their parents. And I'm not saying your
4   parents abused you. Your parents simply had other things
5   that kept them occupied. They made other choices. That
6   doesn't mean the choices that you made need to be shifted to
7   anybody else. But you -- it's no surprise that it's a
8   vortex and that it's terribly, terribly sad to see somebody
9   with your intelligence, instead of being celebrated by
10  taking those two months, if your parents cared about you and
11  really cared about that environmental movement, why didn't
12  somebody go with you? You are 16 years old. If you are
13  going out for two months, I mean, I just -- it just doesn't
14  even make sense. That's not how you raise children. That's
15  not how you care about people who are not able to make those
16  kinds of decisions.

17      So I hope today somebody listens and understands
18  that if we don't step in and put in place supervision,
19  caring adults for children who either don't have it in their
20  home because their parents are either too self-absorbed or
21  have other things that they pay attention to, or children
22  simply are born into families that don't have that kind of
23  social structure, then judges will be sentencing people to
24  prison for years to come.

25      Now, lots of people leave the bench and go home

1   and just try to get through the day because these are not

2   easy days for people in this system.  But all it does for me

3   is tell me, get back into the community and put services in

4   place for kids who don't have caring adults in their lives

5   and who don't have that kind of structure, and literally

6   stand up to people who should have known better and tell

7   them, you owe this child, this young woman, you owe her to

8   be there and to help her reintegrate and to be supportive of

9   her through her incarceration, because you weren't there

10  when she needed you.

11          Probably forever the job that I loved the most was

12  the two years I spent as the juvenile judge, because you

13  truly can have an impact on children and their ability to

14  make decisions.

15          But I'm going to tell you a story about one of

16  them.  I tour facilities.  I don't just read about them.  I

17  go to them.  I have been in almost every institution someone

18  could have a sentenced imposed in this state.  So I have

19  been to MacLaren.  I have been to the training school.  I

20  have been to Hillcrest.  I have been to Sheridan a number of

21  time times.  And I check out the programs, because I feel my

22  obligation to my children is that I have people coming back

23  into the community who will be their neighbors and coworkers

24  or just people they run into that I want people to be in the

25  community who are safe and who are not out there to

1   victimize.

2           So I went to the training school at MacLaren years

3   ago, and we walked into their intense program, that's where

4   the most dangerous young people are kept before they

5   transition over to the adult facility.  And I remembered not

6   quite picking up on the tour guide, a tall, strapping,

7   smart, articulate, seemingly well educated African-American

8   touring us around, dressed nicely, talking about the

9   program, what the opportunities were, how it worked.  And I

10  guess I thought he was a staff person.

11          So I asked him, what's your job here?  And he

12  said, ma'am, I don't have a job here.  I live here.  I said,

13  you do?  Um, why are you here?  And he said, I'm here

14  because I have a probation violation and I'm serving my time

15  here.  And I said, oh.  When is your time over and what will

16  you do when you get out?  And he said, well, ma'am, I'm here

17  on a probation violation because I committed a new crime,

18  and so I'm yet to be sentenced on a crime that I have pled

19  guilty to.  And I said, oh.  And I said, what do you expect

20  with regard to your sentence?  What's the range?  And he

21  said, ma'am, I will spend the rest of my life in prison.  I

22  said, really?  Why?  Well, you see, I was a member of a

23  gang.  And it meant everything to me to be part of the gang.

24  I felt I belonged.  And when I was participating in a

25  drive-by shooting and somebody died, it ended my life.  My

1 life is here. I will pay my debt. I have no -- I harbor no

2 ill-will or no hatred. But the difference is my life will

3 last probably a lot longer than it would on the streets

4 because when you live by those rules on the streets, you die

5 by those rules.

6 That's easily more than ten years ago I met him.

7 He will spend the rest of his life, because he was in a

8 gang, and, like gang activities, when they get out of hand,

9 that's what happens.

10 Your situation, very frankly, is not much

11 different with the exception you will have the opportunity

12 to return to the community.

13 While he's in prison, his commitment is to educate

14 and make life better for people who haven't the intellectual

15 ability that he has or have hatred and anger still deep in

16 their hearts and flail against everyone and any person in

17 authority, and that's his commitment. That's what he will

18 do. That's the service he will pay for the rest of his

19 life. He came to come to understand what he had to accept

20 for his world.

21 So I listen very carefully to what people have to

22 say in the courtroom and whether or not they have really

23 understood the magnitude of what they have done and what

24 they need to do to come back and reform and heal.

25 And I would tell you that unless you believe in

1   people, unless you have a deep sense that people can change,
2   this job will be nothing more than pushing paper. I sit
3   here and I come to work every day because I really do
4   believe we can make a difference. And people can change.
5   And systems can be better. And where people act out and are
6   punished, those punishments will be meted out and they will
7   be done fairly and under the law of the land.

8           At the same time, there can be nothing more
9   important than to give you a belief in the future and hope,
10  and hope that you can come out and be the person that you
11  have on the record today told us you want to be. That you
12  have honor for yourself, and you prove it by walking it
13  every single day for the rest of your life.

14          I think you have started on that path. And I
15  think it was a hard adjustment for you to understand. You
16  were all alone. Even though you joined a gang, you were all
17  alone.

18          While I do commend your parents for recognizing
19  and attempting to underscore your independent spirit, just
20  nothing excuses the absolute and complete lack of judgment
21  in allowing you to go to Cove/Mallard, which began this road
22  and ultimately led to where you are today. I just -- I
23  still just simply, as a parent, can't get over that.

24          And yet, you are very independent, you are
25  intelligent, and so what this is about today is holding you

1 | accountable for your actions.

2 | Like your conspirators, it was your intent to
3 | scare, frighten, and intimidate people and government
4 | through a very dangerous and threatening act of arson.

5 | You also drafted communiques and letters to people
6 | informing them that they could expect further destruction at
7 | their workplace.  I can't even imagine how the OSU professor
8 | must have felt when he read the letter almost blithely
9 | informing him that his entire body of work had been
10 | destroyed and would be targeted again, not to mention the
11 | communiques drafted after each of the arsons.

12 | You have been here for two days, so I'm not going
13 | to repeat just simply how frightening and ridiculously
14 | dangerous your actions were.  And what you don't know is I
15 | have seen and spent a summer treating two individuals,
16 | victims of electrical burns, silver nitrate treatments every
17 | 15 minutes for an eight-hour shift.  Had that BPA tower
18 | landed a little differently, we wouldn't be here, or you
19 | would be so badly burned, you'd wish you weren't here.
20 | That's the kind of reckless behavior that puts so many
21 | people at risk that you don't -- the magnitude of some of
22 | this is just hard to capture.

23 | But most importantly, I need to talk about Vail.
24 | What a crazy, completely irrational and dangerous action.
25 | Driving fuel up a mountain, staying behind so Rodgers could

1  haul it up to the top. Given the circumstances of the fire,
2  you just simply cannot honestly say that precautions were
3  taken to assure the safety of nearby people. The
4  devastation is overwhelming. The film today just is so
5  incredibly huge, the damage done in Vail. It was dangerous
6  and it destroyed the apartment where ski patrol members were
7  moving in and out. Your actions had other consequences for
8  victims of your crimes, such as the loss of jobs, personal
9  possessions, and certainly a sense of security.

10       And then you issued the communique, you will be
11  back if the construction resumed, and that skiers could
12  choose other destinations. The public could not read your
13  mind. It was a threat. Accordingly, you must be held
14  accountable for attempting to intimidate and retaliate
15  against the lawful conduct of government and private
16  individuals.

17       And sadly, at the time of your arrest, you had not
18  removed yourself from the lifestyle and become a productive
19  member of society. Instead, you were continuing criminal
20  activity, although of a different sort.

21       I recognize that you, again, experienced a glaring
22  absence of guidance and discipline in your upbringing. I
23  know you committed the crimes as a young and immature adult,
24  when one does not often think of consequences. And I am
25  truly sad that you were allowed to be exposed, without

1   supervision, without supervision, to a man like William
2   Rodgers at such an impressionable age. And then the lack of
3   a positive authority figure in your life enabled him to
4   exploit your commitment to environmental activism.

5   Perhaps you found it impossible to choose a
6   different path, a path that would enable you to use your
7   passion and considerable talents to effect positive change.

8   But when I mentioned E-LAW earlier and corrected
9   your lawyer to distinguish the Environmental Law Conference
10  from E-LAW, I was happily reminded of the honor I had to
11  host the first environmental law professor from China, who,
12  with very little money and no institutional support, has
13  almost single-handedly created a network for people to
14  report serious and hazardous pollution violations in an
15  attempt to hold polluters liable in China. He has been
16  identified by the *Chicago Tribune* as potentially one of the
17  ten individuals who will truly change the world.

18  He barely stands five feet tall. He is gentle
19  through and through, and he himself, probably because of the
20  toxic spills and systems, has been made short. And he's
21  talked about that because he just simply hasn't had the
22  appropriate environment to grow up in. And as a result, he
23  has many issues that he faces daily. But what he goes about
24  on his daily business is to inspire people to do good things
25  on behalf of their fellow humans. It was a privilege to

1 | host him. And yet at the same time, I wonder what he
2 | thought about how we used violence to make statements in
3 | this state.

4 | So as you said to your lawyers, positive attitudes
5 | result in positive actions, and even in the face of what may
6 | seem insurmountable obstacles. So I appreciate, again, the
7 | statements that your lawyers have made about how you have
8 | traveled well along the way to reform and redemption. It's
9 | not every day that a judge hears defense lawyers speak so
10 | positively about their interactions with clients. And I can
11 | say that very honestly.

12 | However, these mitigating factors, again, only go
13 | so far. You knew your actions were criminal, and you knew
14 | that they were wrong, as evidenced by the great lengths
15 | taken to conceal your identities and to obtain fraudulent
16 | documents as if you knew you'd need them. You committed
17 | these crimes in adherence to the views espoused by your
18 | peers and mentors to fit in with a group that despised the
19 | government. Rather than highlighting threats to the
20 | environment, the effects of your actions are property
21 | damage, psychological damage, loss, destruction, fear, and
22 | this criminal prosecution. No noble cause was furthered,
23 | and for some, the legitimate actions of the environmental
24 | community exist under a cloud of suspicion created by your
25 | actions and the similar actions of others.

1       So I need to just point this out.  The government
2   is more than just an anonymous steel or concrete building.
3   The government is made up of people.  People with outside
4   lives, families, and interests.  You didn't just target
5   property.  You targeted people.  And I want to take a
6   minute, because it isn't often that -- you know, this is
7   what I received this morning.  This is a government worker.
8   Just how we interact between and among ourselves.

9       "Judge Aiken, I want to tell you about an
10      experience that I had this morning.  I had been
11      assisting with a breakfast at a community center
12      that doubles as a homeless shelter in Eugene.  At
13      the shelter, a number of families share a large
14      room, sleeping through the night with minimal
15      comforts, and partitions creating only limited
16      privacy.  Most of the guests are young families,
17      more particularly, mothers and their children.
18      Volunteers also sleep in the partitioned room, and
19      a shift comes in to relieve the overnighters at
20      6:30 and to set up breakfast.  Breakfast is
21      hurried, with most of the guests leaving just
22      after 7:00 on a bus that will assist getting
23      people to school, work, or whatever the day
24      brings.

25      I arrived at 6:30 to learn from the overnight

1 volunteer that one of the guests, Jamie, is

2 turning 11 today.  Her mother wanted to make

3 Jamie's birthday special, despite the adverse and

4 unfamiliar setting.  She got up very early and

5 quietly cut out paper decorations by herself to

6 post in the sleeping area to make the space more

7 cheerful and let Jamie know that celebration was

8 possible and perhaps all the more necessary during

9 this transitional time for her family.

10 Birthday hugs were exchanged instead of

11 balloons, muffins took the place of cake.  Knowing

12 Jamie's favorite fruit, she had already mined the

13 apple flavored oatmeal out of the boxes earlier

14 this week.  We were able to make a special

15 shopping trip for her quickly before the bus

16 arrived.

17 All the guests are grateful for what the

18 shelter offers and for their own abilities to cope

19 with the demands of their own circumstances.  But

20 today, all the children were especially lit up by

21 the simple gesture of kindness that marked Jamie's

22 birthday.  She went on her way to school where she

23 will take a standardized test with the rest of her

24 class.  This shelter will be available again

25 tonight, and tomorrow will be just another day.

1      The sense of possibility and appreciation will

2      continue.  Perhaps later in her life, Jamie will

3      be able to think of this poignant day as a

4      reminder that difficult times can be met with

5      hope.

6      I will think -- I think this day is proof

7      that choosing to meet a challenge with a

8      supportive family and community is always better

9      than allowing adverse circumstances to alienate us

10      from our core values.  The world brims with

11      gentleness and generosity when we seek it.  Add to

12      it.  Let generosity overflow.

13      That's a government worker.  One of the faceless

14   people you were targeting.

15      I also want to note that your incredible

16   cooperation with the government does not go unnoticed.  And

17   I am considering it, particularly in light of the fact that

18   your cooperation led to the acceptance of responsibility by

19   others, and that you initiated the meetings with the

20   coconspirators after you negotiated your plea agreement

21   where you had no expectation of personal gain in doing so.

22   That took courage on your part.

23      I also find it a huge missed opportunity for the

24   defendants who did not agree to meet personally with you.

25   Lawyers too often interject themselves into a very human

1  process that may lead to resolution and transformation.

2  That's their choice.  They made it.  You extended yourself.

3  It's noted.  I appreciate it.  And have brought to

4  resolution a case that would have gone on for months and

5  been much more difficult for everybody in the end.  And for

6  that, and for that courage, that is noted.

7  The government stood by their agreement.  I'm

8  actually kind of disappointed they didn't recognize that

9  after the plea effort on your behalf, and so I am going to

10  do so.

11  But I think your last comment on the DVD is where

12  I want to end.  You know, I have said it in two other

13  sentencings.  I am going to repeat it because it's the

14  mantra I want everyone to come away with.  And that is, fear

15  and intimidation can play no part in changing the hearts and

16  minds of people in a democracy.

17  But I really think your last comment in the DVD

18  says it best.  One needs to act out of love and respect

19  rather than from fear and anger.  If that is truly how you

20  feel, you will serve your time and then you will come out

21  and you will pay your debt and you will serve others.

22  So accordingly, I find the guidelines calculations

23  apply to the offenses as grouped pursuant to 3D1.1 as

24  follows:

25  Case No. 06-60079, Count 1, conspiracy.

1              Pursuant to 3D1.2, conspiracy is grouped with the

2    underlying substantive offense, and, accordingly, the

3    conspiracy count is grouped with the substantive offenses

4    below.

5              Count 2, arson of Childers Meat Company.

6              The government agrees that this offense cannot be

7    considered as a federal crime of terrorism.  Therefore, I

8    find that the base offense level is 6 with an upward

9    adjustment of 13 levels for the amount of loss and two

10   levels for more than minimal planning, resulting in an

11   offense level of 21.

12             Count 3, Boise Cascade.

13             Similarly, the base offense level for this offense

14   is 6, with an upward adjustment of 14 levels for amount of

15   loss and two levels for more than minimal planning.

16             The government contends that this offense

17   qualifies for the terrorism enhancement because Boise

18   Cascade harvested timber from federal lands.

19             However, the communique issued after this offense

20   referenced Boise Cascade's intent to ravage the virgin

21   forests of Chile and did not mention any conduct of the

22   government.  Therefore, I find that the government has not

23   established that the offense was calculated to influence or

24   affect the conduct of government by intimidation or

25   coercion, or to retaliate against government conduct,

1 resulting in an offense level of a 22.

2 Count 4, destruction of an energy facility.

3 The base offense level for this offense is 6, with
4 a ten-level increase based on amount of loss. Further, 18
5 U.S.C. § 1366(a) is enumerated under 2332b(G)(5)(b) as a
6 crime of terrorism, and the offense was calculated to
7 influence or to affect through coercion or intimidation, or
8 to retaliate against government conduct.

9 As recognized by Mr. Weinerman and the court, it
10 is somewhat absurd that Mr. Meyerhoff's statement can be
11 used against Ms. Gerlach but not against him. Such are the
12 absurdities of the guideline and of the law sometimes.
13 However, I must be consistent with my previous rulings.
14 Therefore, a 16-level enhancement will apply as required by
15 3A1.4, for an offense level of 32.

16 Count 5, arson of Eugene Police -- of the Eugene
17 Police Department Public Safety Station.

18 The base offense level for this offense is 20.
19 Further, 18 U.S.C. § 844(i) is enumerated under
20 2332b(G)(5)(b). And based on the totality of the evidence,
21 the only possible conclusion I can reach is that the
22 defendant intended to retaliate against the conduct of
23 government.

24 Further, with Mr. Meyerhoff and Mr. Tubbs, I did
25 not rely on the statements of any defendants except those of

1   Mr. Tubbs in applying a role enhancement to Mr. Meyerhoff.

2        Rather, I based my decision, as I do in this case,

3   on the totality of the circumstances regarding the attitudes

4   and activities of the defendants and the fact that they

5   targeted a police station. It sort of speaks for itself.

6   Even if this offense does not qualify as a terrorism

7   enhancement, I would exercise my discretion to depart under

8   5K2.0. Therefore, the offense level is 32.

9        Count 16 through 18, arson at Jefferson Poplar.

10        The base level for this offense is 6, with a

11   13-level upward adjustment for amount of loss and a

12   two-level upward adjustment for more than minimal planning.

13        As I found with Mr. Meyerhoff and Mr. Tubbs, the

14   statement in the communique, authored by defendant, reveals

15   that the offense was intended to send a message to the

16   government that legislation is ineffectual. Even though

17   defendant did not participate in the actual arson, she

18   assisted in the planning and the communique, and her

19   relevant conduct includes the reasonably foreseeable actions

20   of others taken during the commission of this offense.

21   Thus, I find the purpose of the offense was to influence or

22   affect the conduct of government. Because 18 U.S.C.

23   § 844(i) is identified as a federal crime of terrorism, a

24   12-level upward departure applies.

25        Regardless, even if this offense did not qualify

1  for the enhancement, I would exercise my discretion under

2  5K2.0 to depart upward for the reasons stated in

3  Mr. Meyerhoff's sentencing.  Therefore, the base level

4  offense is 33.

5         Finally, I decline to impose a terrorism

6  enhancement under the conspiracy count given I have imposed

7  the enhancement or imposed an upward departure based on

8  grouped offenses.

9         Case No. 06-60122, Counts 1 through 8, arson of

10  the Vail Ski Resort.

11         The base offense level is 6, with a 17-level

12  increase for amount of loss, and a two-level increase for

13  more than minimal planning.

14         The government contends that this offense

15  qualifies for the terrorism enhancement, because it was

16  intended to retaliate against the government for granting

17  the Vail Associates a permit for the resort expansion.

18         However, the communique issued after this offense

19  referenced Vail Associates and did not mention any conduct

20  of the government.  Therefore, I find that the government

21  has not established that the offense was calculated to

22  influence or affect the conduct of government by

23  intimidation or coercion, or to retaliate against government

24  conduct, resulting in a base offense level of 25.

25         Multiple count adjustments.

1           Pursuant to 3D1.4, the combined offense level for

2  multiple counts is determined by taking the offense level

3  applicable to the group with the highest offense level and

4  increasing that offense level by a specified amount.

5           In this case, the group with the highest offense

6  level is 33.  The offense levels of the remaining groups

7  totaled 3.5 units, and the court must increase the offense

8  by 4, resulting in a combined offense level of 37.

9           Upward departures.

10           Under the sentencing guideline 5K2.0, I have the

11  discretion to depart where the guidelines do not adequately

12  take into account aggravating circumstances of the offense

13  conduct.  Here, 3A1.4 does not adequately take into account

14  the defendant's intent to frighten, intimidate, and coerce

15  private individuals through her actions.  The communiques

16  associated with the Vail arson threatened future actions,

17  like Boise Cascade and like Childers Meat arsons.

18           Therefore, I exercise my discretion under 5K2.0 to

19  depart upward by four levels, resulting in a base offense

20  level of 41, the offense level that would have resulted had

21  the enhancement applied to these offenses.

22           With regard to acceptance of responsibility, you

23  are entitled to a three-level downward departure for the

24  acceptance of responsibility, resulting in adjusted offense

25  level of 38.

1          I appreciate the arguments made by Mr. Weinerman,
2    but I'm going to hold to my conclusion and analysis that
3    your criminal history category, although you have zero
4    criminal history points, which would result in a criminal
5    history category of I, that pursuant to 3A1.4, your criminal
6    history category is established at a VI.

7          This results, then, in a guidelines range, based
8    on an offense level of 38 and a criminal history category of
9    VI, of 360 months to life.

10         Mr. Peifer, do you have a motion?

11         MR. PEIFER:  Yes, Your Honor.  Under section 5K1.1
12   of the guidelines, we would ask the court to depart downward
13   for substantial assistance.  As I compute it, that would be
14   from level 38 down to level 26, which is 12 levels.  And we
15   would recommend the guideline range of 120 to 150 and would
16   recommend the bottom range sentence of 120 months.

17         THE COURT:  Downward departures.

18         Likewise, I have the discretion to depart downward
19   under 5K2.0 for mitigating circumstances not taken into
20   account under the guidelines.

21         I want to make it clear through my comments -- I
22   want to make it clear that through my comments to
23   Mr. Meyerhoff, I in no way intended to create the impression
24   that cooperating without the advice of counsel, a
25   constitutional right, is more -- somehow more deserving or

1  worthy or will be given greater consideration.

2        I also recognize Mr. Meyerhoff was motivated in
3  part by self-preservation. But I noted it to reflect what I
4  saw was a tremendous desire on behalf of Mr. Meyerhoff to
5  unburden himself and to put behind the actions of his past.

6        I took the defendants' cooperation individually,
7  and I do so in each case and in the context of who they are
8  and where they are in their lives.

9        Here, I find the defendant rendered extraordinary
10  cooperation, particularly after her guilty plea, by
11  assisting the government in obtaining guilty pleas from
12  other defendants. And further, that her motive for doing so
13  extended beyond the desire for personal gain.

14        I also acknowledge that she -- that had she not
15  been exposed to certain individuals and others like him, she
16  might not be here today.

17        But I have to balance that against the serious
18  nature of the offenses and the fear and damage that was
19  caused, not only through actions but through her threats.

20        I therefore depart downward by two levels, for a
21  final offense level of 24 and a sentencing range of 100 to
22  125 months.

23        In addition to the calculations of the sentencing
24  guidelines, which are advisory, not mandatory, I have taken
25  into account those factors set out in 18 U.S.C. § 3553, and

1  looking at those, for the record, nature and circumstances
2  of this offense; your own criminal history and
3  characteristics; the goals of sentencing, punishment,
4  deterrence, rehabilitation, community safety; and other
5  factors that the court must take into account to fashion a
6  reasonable but not greater than necessary sentence for the
7  conduct before the court.

8          Accordingly, Case 6 -- 06-60079, Count 1, you are
9  committed to the Bureau of Prisons for confinement for a
10  period of 60 months.

11         With regard to Case 06-60079, Counts 2 through 18,
12  you are committed to the Bureau of Prisons for confinement
13  for a period of 108 months, to be served concurrent with the
14  sentence imposed in Count 1, and with each other.

15         With regard to Case 06-60122, Counts 1 through 8,
16  you are committed to the Bureau of Prisons for confinement
17  for a period of 108 months to be served concurrent with the
18  sentence imposed in Case 06-60079, and with each other.

19         You are required, as a part of this order, to pay
20  full restitution to the victims identified in the
21  presentence report in the amount of $15,988,752.42, jointly
22  and severally with the codefendants, Kevin Tubbs, Stanislas
23  Meyerhoff, Daniel Gerald [sic] McGowan, Josephine Overaker,
24  Suzanne Savoie, Nathan Block, Joyanna Zacher, and Jacob
25  Ferguson.  I will waive interest.

1        Upon release from confinement, you shall serve a

2    three-year term of supervised release, subject to the

3    standard conditions of supervision and the following special

4    conditions:

5        First, you shall cooperate in the collection of

6    DNA as directed by your probation officer, if required by

7    law.

8        Again, with regard to the restitution, you shall

9    pay the full restitution to the victim identified in the

10    presentence report in the amount of $15,988,755.42, jointly

11    and severally with Kevin Tubbs, Case 06-60070; Stanislas

12    Meyerhoff, 6 -- excuse me -- 06-60078 and 06-60122; Daniel

13    Gerald [sic] McGowan, 06-60124; Josephine Overaker,

14    06-60011; Suzanne Savoie, 06-60080; Nathan Block, 06-60123;

15    Joyanna Zacher, 06-60126; and Jacob Ferguson.

16        If there is any unpaid balance at the time your

17    release from custody, it shall be paid at the maximum

18    installment possible and not less than $200 a month or 10%

19    of your gross income, whichever is greater.

20        You are prohibited from incurring new credit card

21    charges or opening additional lines of credit without the

22    approval of your probation officer.

23        You shall authorize release to the U.S. probation

24    officer any and all financial information by execution of a

25    release of financial information form, or by any other

1   appropriate means, as directed by your probation officer.

2        Next, your employment shall be subject to approval

3   by the probation officer.

4        Next, you shall disclose all assets and

5   liabilities to your probation officer. You shall not

6   transfer, sell, give away, or otherwise convey any asset

7   with a fair market value in excess of $500 without approval

8   of your probation officer.

9        Next, you shall have no contact with individuals

10   known to be involved or having been involved in any

11   environmental or animal rights group without approval of the

12   court.

13        Next, you shall not participate in any

14   environmental or animal rights activism, or belong to any

15   group or organization whose primary purpose is environmental

16   or animal rights activism without approval of the court.

17        No fine is being imposed. I'm making the finding

18   you do not have financial resources nor an appreciable

19   earning ability to pay the fine.

20        However, you are required to pay the fee

21   assessment in the amount of $2,600.

22        You entered into this plea agreement waiving all

23   or a part of your appeal rights. If you wish to file a

24   notice of appeal, you may do so. If you cannot afford to do

25   so, contact the clerk's office. It will be done for you for

1 | free, but it must be done within ten days.

2 | I know there is a recommendation. I -- I am very

3 | hopeful that Dublin will be selected. And I would like very

4 | much to be kept apprised of the placement process.

5 | And just as I indicated to Mr. Meyerhoff, given

6 | the nature of your approach during the period of time in

7 | which you will serve your sentence, I would appreciate it if

8 | you would write the court every six months. I would like to

9 | know what's made available to you, what's working, what's

10 | not working, and how you are doing.

11 | THE DEFENDANT: Okay.

12 | THE COURT: All right?

13 | Mr. Weinerman.

14 | MR. WEINERMAN: Judge, I assume the court has the

15 | same feelings about that condition of supervised release

16 | that you mentioned in the Meyerhoff sentencing. I had filed

17 | an objection that it was too broad, and the court seemed to

18 | say that the court had no problem with Ms. Gerlach being

19 | involved in mainstream activity like joining the Sierra Club

20 | or going to see *An Inconvenient Truth* in the movies,

21 | something like that.

22 | THE COURT: I'm not going to have any problem with

23 | that. I fully intend to be here and will modify that

24 | accordingly so that when -- there's no misunderstanding on

25 | her supervised release what are the expectations. I don't

1    have any problem with that.  But I think I want to at least

2    have that as a point of reference so that there can be a

3    look at what would be appropriate so that everybody is on

4    the same page and there's no misunderstanding on the part of

5    the defendant or on the part of the supervising release

6    officer.

7         MR. WEINERMAN:  Thank you, Judge.  We would ask

8    for the recommendation for FCI Dublin, and we'll work with

9    the court and the government, hopefully, if you are willing,

10   to write a letter on Ms. Gerlach's behalf.

11        The last thing we would like to bring up is our

12   request that she be released pending her self-surrender to

13   the facility designated by the Bureau of Prisons.  And the

14   reason we are asking for this is twofold.  Number one, there

15   is some new information since Ms. Gerlach came before the

16   court in December of 2005, and that is the government has

17   taken a different view of her than they took of her in

18   December of 2005.  The government no longer views her as a

19   flight risk.  They no longer view her as a danger.

20        And the reason they -- and I'm not speaking for

21   them, obviously, but I suspect the reason they feel that way

22   is they know her now.  They have gotten to know her.  They

23   met with her close to 20 times.  They have gotten to know

24   who she is, and I'm sure they don't oppose that lightly, but

25   that is their position.  And I think the court always gives

1   deference to the government's view as to flight risk and
2   detention. I'm not saying that they should have the final
3   say either way, but I think in this case they are correct in
4   not opposing it.

5           The second reason we think the court should grant
6   this motion is the effect it might have in the designation
7   process. We heard testimony from the BOP expert in
8   Mr. Meyerhoff's sentencing who said that if BOP feels that
9   the court and/or the government trusts a defendant to
10  self-surrender, that goes a long way in what they decide to
11  do as far as designation.

12          So the hope that she will wind up in FCI Dublin I
13  think is facilitated and improved if she is allowed to
14  self-surrender. I believe she can be trusted. She has a
15  brother who is willing to allow her to stay with him. The
16  court made some critical comments about the family. I
17  understand that. But, you know, the brother was not
18  involved in that. And he is a responsible person, owns his
19  own home, owns his own business. I don't think, based on
20  everything that has happened in this case, that Chelsea
21  Gerlach will violate this court's trust if the court grants
22  the motion.

23          MR. ENGDALL: Your Honor, the government -- if I
24  may, the government's position is not one of advocacy for
25  her release, but we do withdraw our previous opposition to

1    that release agreement and defer that release decision to

2    any and other additional analysis by the pretrial services

3    and this court.

4              THE COURT:  I don't see -- I know that

5    Mr. Stranieri was here earlier.

6              MR. STRANIERI:  I'm here, Your Honor.

7              THE COURT:  Oh, you are over there.  Sorry.

8              MR. STRANIERI:  That's okay.

9              THE COURT:  What's your position, Mr. Stranieri?

10             MR. STRANIERI:  Your Honor, pretrial services

11   opposes Ms. Gerlach's release.  I respect Mr. Weinerman's

12   position on this and the government's.  It's a difficult

13   decision.  But there really isn't, from a pretrial

14   perspective, much that has changed.  And that is

15   unfortunate, I guess, that we don't know Ms. Gerlach as well

16   as the government, in a sense, does.

17             But as far as a combination of conditions to

18   reasonably assure her future court appearances or the danger

19   to the community, I don't see that anything has changed from

20   when she first was arrested.

21             MR. WEINERMAN:  Judge, can I -- I just want to

22   mention one thing.  You know, this -- I keep using this

23   roller coaster analogy.  The last page of the pretrial

24   services report, the court will see that when Ms. Gerlach

25   made her first appearance in Portland on December 8th, 2005,

1   pretrial recommended release, and it was deferred until

2   Ms. Gerlach arrived in Eugene.  And then I think pursuant to

3   the government's strong position that she was a flight risk

4   and a danger, they changed their recommendation and

5   recommended detention.

6           And now a lot of time has passed, and the

7   government views it differently.  So I think what motivated

8   the change in the recommendation was the government's strong

9   opposition to her release.  The government no longer has

10   that strong opposition, and I think that's significant.

11           THE COURT:  You know, Ms. Gerlach, this is the --

12   this is a hard decision, and I will tell you why.  And I

13   know what I'm going to do, and it's really out of an

14   abundance of caution, because here somebody has to say no

15   and have boundaries for you, and I'm going to be that

16   person.  That's what parenting is about.  I want you to

17   get -- this will count for your time of service.  I suspect

18   you will get into Dublin.  I don't think your being out and

19   then going back in is going to have that significance in

20   this particular instance, and I'm willing to battle that

21   out.

22           But I would just as soon err on the side of you

23   not getting yourself into one more minute of trouble or

24   going sideways or having any reason to concern anyone.  Just

25   carry on and get it done.  So I'm not going to authorize

1   your release, and you will begin serving your time.

2          And this is the message to anyone who is going to

3   be sentenced.  They need to be ready to go into custody, and

4   I mean that.  We are going to move through these cases, and

5   people are going to serve their time and move on back into

6   the community, and then, as Mr. Weinerman, which did amuse

7   me earlier, quoted me to me, actions speak louder than

8   words.  And everyone in this community far and wide will be

9   watching whether or not what you said in this courtroom was

10  really honest or not.

11         And back for your parents, you know, Mr. Weinerman

12  just said -- you know, made a note that I was critical of

13  them.  No parent is perfect.  We all make mistakes as

14  parents and as adults in people's lives, but every once in a

15  while when that's called to our attention, we know we need

16  to step up.

17         So the book that I referred to is called *The*

18  *Measure of our Success*.  Those are our children, whether

19  they are our individual children or the community's

20  children.  So you have a lot of life as parents still ahead

21  of you.  And so you have a chance to pay back when you just

22  simply didn't pay enough attention to a young person who

23  needed guidance and needed a caring adult making her the

24  number one item in your life.  When we bring children into

25  the world, what we want and what our choices may be comes

1   second to caring for our children. And had she been put

2   first, maybe today would be a very different day.

3           But I'm going to be that parent, and I'm going to

4   set the boundaries, and I'm not releasing you. And it's

5   because, when people set boundaries and kids rebel against

6   boundaries, they find out if people really care about them.

7   I care enough about you not to see you make one more

8   mistake.

9           All right? So serve your time. Give to the

10  community of women that you will work with, most of whom

11  have very little education, come out bilingual, and come out

12  and be ready to plant the garden you talked about.

13          Okay? Good luck.

14          THE CLERK: Court is in recess.

15          *(The proceedings were concluded this*

16          *25th day of May, 2007.)*

17

18

19

20

21

22

23

24

25

1          I hereby certify that the foregoing is a true and

2    correct transcript of the oral proceedings had in the

3    above-entitled matter, to the best of my skill and ability,

4    dated this 5th day of July, 2007.

5

6

7    _____
     Kristi L. Anderson, Certified Realtime Reporter

8

9                                          

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25